*In re* MARRIAGE OF DAVID BRAMSON, Petitioner-Appellee, and SUZAN BRAMSON, Respondent-Appellant.

First District (1st Division)   No. 79-771

Opinion filed April 21, 1980.

658

George B. Collins, of Collins & Amos, of Chicago, for appellant.

William J. Harte, Ltd., of Chicago, for appellee.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

David Bramson, petitioner, sought termination of maintenance payments against his former wife, Suzan Bramson, in the circuit court of Cook County. Following a hearing where Mrs. Bramson was the sole witness, the trial court found her conduct amounted to cohabitation on a resident, continuing conjugal basis under section 510(b) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (Ill. Rev. Stat. 1977, ch. 40, par. 510(b)). The court accordingly granted the petition to terminate Mr. Bramson's future maintenance obligations.

Mrs. Bramson appeals, contending that (1) the marital settlement agreement, by implication, precluded the trial court from applying section 510(b) of the Marriage Act; (2) the evidence does not show cohabitation on a resident, continuing conjugal basis; (3) Mr. Bramson acquiesced in the conduct of Mrs. Bramson and is estopped from seeking termination of maintenance; and (4) section 510(b) of the Marriage Act, as applied, is an unconstitutional infringement upon the marital settlement agreement and impairs the right to contract.

Mr. and Mrs. Bramson were married on February 7, 1963. They have three children, aged nine, seven and four. On January 16, 1974, the Bramsons were divorced. Incorporated into the divorce decree was a marital settlement agreement dated and signed by the parties on

December 18, 1973. The agreement provided, among other things, that Mr. and Mrs. Bramson were to have joint custody of the children. The children were to reside permanently in the former marital home and the parents were to alternate residence with the children annually. Mr. Bramson was to pay the expenses of the marital home. Mrs. Bramson was to provide an apartment where the "off year" parent would live while the "on year" parent stayed with the children in the marital home. Visitation rights of the "off year" parent were to be liberal, frequent and by arrangement.

Whether the children were in the physical custody of Mr. or Mrs. Bramson, Mr. Bramson was to pay all monies he had customarily paid prior to the divorce for the children's support and maintenance. Mr. Bramson also was to pay Mrs. Bramson $11,000 per year maintenance. According to the agreement, these payments continued on monthly installments until either (a) the remarriage of Mrs. Bramson, (b) the death of Mrs. Bramson, or (c) in the event of Mr. Bramson's death, the first payment to Mrs. Bramson from an insurance trust.

The agreement further provided that in the event of remarriage, any necessary adjustment would be made "consistent with the intents, methods and purposes of this agreement."

When Mr. Bramson remarried, he and his wife no longer intended to occupy the "off year" apartment. According to Mrs. Bramson, during the summer of 1977 she talked to Mr. Bramson about moving into Jack Galprin's apartment for a temporary period of time; he said fine, go ahead. At the time of their divorce, they had also discussed living with people and decided this would be acceptable so long as the children knew the other party.

In September 1977, Mrs. Bramson moved from the "off year" apartment to the residence of Jack Galprin. She was residing there on October 1, 1977, when the new Marriage and Dissolution of Marriage Act went into effect. In January 1978, upon receiving service of Mr. Bramson's petition to terminate maintenance, Mrs. Bramson moved to the apartment of a female friend.

Mrs. Bramson testified that while she lived with Galprin they shared the same bed. Galprin would also sleep over from time to time while she lived at the marital home during August 1977. After moving out of Galprin's apartment, Mrs. Bramson returned to stay overnight about 20 times. They also have taken trips together. However, both she and Galprin dated other people.

Mrs. Bramson shared expenses with Galprin; she paid for most of the food, shared the expense of a housekeeper, paid $100 to $150 per month for housing and paid a plumbing bill when she caused some damage.

With the exception of holiday gifts, she bought her own clothes. Bramson considered herself to be sharing expenses as would any roommate. She did most of the cooking and Galprin handled most repairs.

When the children visited their mother at Galprin's apartment, she provided their food, bus tokens and paid entertainment expenses. Bramson moved in with Galprin, in part, because his home was large enough for comfortable visitation with the children.

Mrs. Bramson put her own name on Galprin's door and never went by or used the name Mrs. Galprin. Her voter's registration listed the marital home as her address. Other identification listed other addresses. In accordance with the settlement agreement, Mrs. Bramson intended to return to the marital home on August 15, 1978. She testified that her residence with Galprin was designed to be temporary.

Based on this evidence and the briefs and arguments of the parties, the trial court ruled from the bench that:

> "The question was, whether a woman who lives with another man not her husband can still get alimony from her present husband. I believe that is the legal question.
>
>                            \*   \*   \*
>
> And it was testified, the husband had paid alimony during this period. I believe the new statute is designed to protect such a husband. Once you live with a man, you have voided your chance to get alimony. I have so ruled.
>
> My ruling is that she no longer has a right to alimony from this man. You can't live with somebody else and expect a husband to take care of you."

The written, final order provides, in part:

> "\* \* \* [T]he law in Illinois is that where a woman lives with another man, not her husband, she is no longer entitled to alimony and her right to alimony is thereby terminated."

On appeal, Mrs. Bramson first contends that the terms of the 1973 settlement agreement solely governed termination of maintenance, thus precluding application of section 510(b) of the Marriage Act. The settlement agreement provided for termination of maintenance payments if either Mrs. Bramson died or remarried or if Mr. Bramson died and Mrs. Bramson received payment from his insurance trust.

The agreement further provided that the parties waived all property rights and claims by reason of the marital relationship whether then existing or arising under future laws. Although not clearly articulated in her brief, we construe Mrs. Bramson's argument to be that the parties waived the right to terminate maintenance except as provided in the agreement and thus waived application of section 510(b).

■■ Section 510(b) provides:

"The obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." (Ill. Rev. Stat. 1977, ch. 40, par. 510(b).)

This provision is drawn in part from section 316(b) of the Uniform Marriage and Divorce Act, which reads:

"*Unless otherwise agreed in writing or expressly provided in the decree*, the obligation to pay future maintenance is terminated upon the death of either party or the remarriage of the party receiving maintenance." (Emphasis added.) (9A Uniform Laws Annotated 183 (1979).)

The omission from the Illinois act of the preamble clause contained in the Uniform act indicates that the terminating events contained in section 510(b) are mandatory. Neither the parties pursuant to agreement nor the courts can avoid the statute's directive. See *Duvall v. Duvall* (1972), 8 Ill. App. 3d 53, 289 N.E.2d 59 (by incorporating settlement agreement in the decree, the court does not divest itself of the power to modify); *cf. Fawkes v. Fawkes* (1977), 115 Ariz. App. 384, 565 P.2d 890 (wife's fixed, nonmodifiable maintenance for one year ceased on her remarriage by operation of statute); *Fye v. Zigoures* (1977), 114 Ariz. App. 579, 562 P.2d 1077 (nonmodifiable maintenance award to wife terminated on her death notwithstanding parties' agreement to the contrary).

Accordingly, the provision of the new Marriage and Dissolution of Marriage Act applies regardless of the settlement agreement. We turn, then, to the crux of this case: whether the evidence supports the trial court's finding that maintenance terminate.

The requirement that maintenance terminate upon the recipient's residing with another person on a resident, continuing conjugal basis presumably was added to the Marriage and Dissolution of Marriage Act to avoid the injustice of *Atwater v. Atwater* (1974), 18 Ill. App. 3d 202, 309 N.E.2d 632. There, a former wife who had been living in a common law marriage arrangement was held entitled to receive alimony because she had not actually remarried. Since Illinois does not recognize common law marriages (*Wilson v. Cook* (1912), 256 Ill. 460, 100 N.E. 222; Ill. Rev. Stat. 1977, ch. 40, par. 214), the court had no alternative save to confirm her entitlement to alimony.

Two appellate courts have interpreted section 510(b) to date: *Schoenhard v. Schoenhard* (1979), 74 Ill. App. 3d 296, 392 N.E.2d 764, and *In re Support of Halford* (1979), 70 Ill. App. 3d 609, 388 N.E.2d 1131.

In *Halford*, the evidence showed that Wayne Green lived with Mrs. Halford for over three years and continued to live with her during the proceedings. He did not pay rent, but gave her $40 a week for meals and

miscellaneous expenses. Mrs. Halford admitted having sexual intercourse with Green three or four times since he had been living there. There was also evidence indicating their relationship was as close and affectionate as a married couple's in other respects.

The circuit court found that Halford cohabited with Green on a resident, conjugal basis and the appellate court agreed. However, the appellate court reversed the circuit court's finding that the evidence was insufficient to establish the continuing nature of the conjugal relationship because Halford admitted only to having sex with Green three or four times. The appellate court found that circumstantial evidence amply established the continuing nature of the conjugal relationship.

The *Halford* court found that our legislature intended termination of an ex-spouse's obligation to pay future maintenance to be appropriate "whenever the spouse receiving the maintenance has entered into a husband-wife relationship with another, whether this be by legal or other means." (70 Ill. App. 3d 609, 612, 388 N.E.2d 1131, 1134.) The court reasoned that the legislature apparently believed a supporting spouse should be relieved of maintenance obligations if the former spouse has, *in fact*, entered into a relationship which amounts to that of husband and wife. The court noted, however, that "lesser involvement" by the person receiving maintenance should not require termination of maintenance. 70 Ill. App. 3d 609, 613, 388 N.E.2d 1131, 1134.

In *Schoenhard*, the second district agreed with the *Halford* court's reasoning that maintenance abate when a husband-wife relationship exists. *Halford* was distinguished on the facts, however. Plaintiff testified that she lives with a man about 50 percent of the time and has sexual relations with him. She has no apartment of her own and lives with her parents when not with the man. She does his cleaning, cooking and cares for his children. Plaintiff uses her own name, pays her bills and is obligated to repay any money the man gives her. The *Schoenhard* court upheld the trial court's conclusions that plaintiff did not reside with a man on a continuous basis and that no husband-wife relationship existed.

■■ Guided by these cases, we now consider whether Bramson and Galprin, in fact, established a husband-wife relationship and whether their cohabitation was continuous in nature. (Mrs. Bramson concedes that her arrangement with Galprin was resident and conjugal cohabitation.)

By our opinion we do not approve or condone her living arrangement (see *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 400 N.E.2d 421; *Hewitt v. Hewitt* (1979), 77 Ill. 2d 49, 394 N.E.2d 1204; *De Franco v. De Franco* (1979), 67 Ill. App. 3d 760, 770, 384 N.E.2d 137); rather, we conclude only that her conduct does not fall within the provisions of section 510(b).

Because Bramson resided with Galprin for only 4½ months (one

month of which occurred before the new Act took effect) and intended to move to the marital home with her children in August 1980, we cannot say her cohabitation with Galprin was continuous. Her testimony that she intended to reside with Galprin on a temporary basis was uncontroverted. Even assuming that she would spend her "off years" at Galprin's (perhaps an unwarranted assumption since Bramson left Galprin's upon notice of the instant petition), that situation would be similar to *Schoenhard*, where the ex-wife lived with a man 50 percent of the time.

We also believe that the evidence falls short of establishing a husband-wife relationship. Both Bramson and Galprin dated other people. Bramson considered her arrangement as rooming with a friend on a temporary basis until she rejoined her children. She moved in with Galprin, in part, to provide more room for visitation with her children. Bramson retained her name, received mail at more than one address and had identification cards listing several addresses. Additionally, there is no indication in the record that Bramson and Galprin commingled their funds, as might be expected in a husband-wife relationship.

The *Halford* court discerned the legislative scheme as establishing a dividing line between conduct tantamount to a husband-wife relationship, yet lacking legal formalities and "lesser involvement" by the maintenance recipient. We concur with their interpretation. The plain meaning of the statute indicates that not every conjugal cohabitation justifies termination of maintenance, since "conjugal basis" is but one element of the provision.

■ Moreover, the legislative intent does not appear to be an attempt to control public morals. (*Cf. Hall v. Hall* (1975), 25 Ill. App. 3d 524, 323 N.E.2d 541 (wife's right to alimony was not affected by moral quality of her post-divorce conduct).) Rather, an important consideration, divorced from the morality of conduct, is whether the cohabitation has materially affected the recipient spouse's need for support because she either received support from her co-resident or used maintenance monies to support him. See generally 4 F.L.R. 2081, 2112, 2249, 2292, 2316 and 2325.

Here, Bramson did neither, but instead shared expenses and chores with Galprin. She paid for most of the food, paid $100 or sometimes $150 each month for housing and split housekeeper expenses. She bought her own clothes and paid one plumbing bill.

■ In short, we view the trial court's assertion that "[o]nce you live with a man, you have voided your chance to get alimony" to be an overbroad and erroneous interpretation of legislative intent. We reverse its judgment as contrary to the manifest weight of the evidence and not supported by law.

Accordingly, the order of the circuit court of Cook County terminating the award of maintenance is reversed. Because of our disposition, we need not consider Mrs. Bramson's estoppel and impairment of contract arguments.

Reversed.

GOLDBERG, P. J., and McGLOON, J., concur.