*In re* MARRIAGE OF CAROLEE MASS, a/k/a Carolee Eichelman, Plaintiff and Respondent, Appellant and Cross-Appellee, and ALFREDO MASS, Defendant and Petitioner, Appellee and Cross-Appellant.

First District (4th Division)    No. 80-1521

Opinion filed December 23, 1981.

Diver, Bollman, Grach & Quade, of Waukegan (Robert E. Lessman and Brian S. Grach, of counsel), for appellant.

Schiller & DuCanto, Ltd., of Chicago (Joseph N. DuCanto, Anthony L. Russo, and Paul J. Bargiel, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Respondent, Carolee Eichelman, appeals from an order entered in the circuit court of Cook County which, in effect, lowered the amount of support payments being made to her by petitioner, Alfredo Mass. Alfredo cross-appeals from the same order which denied his petition for modification of the support payments.

We reverse and remand.

BACKGROUND

After 19 years of marriage, Alfredo and Carolee Mass (now Carolee Eichelman) were divorced by a decree entered in the circuit court of Lake County on September 26, 1973. At the time of the divorce, Alfredo was earning $110,000 per year as a pathologist employed by a hospital. Carolee was a homemaker with no income of her own. There were six children ages 18, 17, 14, 13, 11, and eight.

Two weeks prior to the entry of the decree of divorce, Alfredo and Carolee entered into a "Property Settlement Agreement." The agreement provided for an equal division of the couple's family home which was to

be sold upon divorce, and provided for Alfredo's keeping in force, for the benefit of Carolee, all life insurance policies held on his life (the policies had a face value of $195,000). Except for the foregoing, it does not appear that either of the parties had any other significant interests in property or otherwise.

The agreement provided that Alfredo was to assume the custody and support of the two older children and Carolee the custody and support of the four younger children. Both parties agreed to assume such custody and support until the children had completed their "Post-Graduate College studies." The most significant term of the agreement, and the one that has caused the controversy here, was the following:

"THE HUSBAND AGREES:

To pay to the wife for her maintenance and support during her lifetime and over a period of twenty years, regular monthly installments according to the following schedule, commencing JANUARY 1, 1974:

| | | |
|---|---|---|
| $4,583.33 x 144 months | (12 years) | $659,999.52 |
| $3,783.33 x  24 months | ( 2 years) | 90,799.92 |
| $2,983.33 x  24 months | ( 2 years) | 71,599.92 |
| $2,183.33 x  24 months | ( 2 years) | 52,399.92 |
| $  800.00 x  24 months | ( 2 years) | 19,200.00 |
| TOTALS: | (20 years) | $893,999.28 |

At the end of the twentieth year, or by agreement at the end of any calendar year, the monthly amount may be negotiated between the parties. However, the sum agreed to be paid the wife shall be subject to change in accordance with the changed circumstances of the parties, and in accordance with the needs of the wife and the earning capacity of the husband, and in the event either party desires a change of monthly payments and they are unable to agree on the amount to be thereafter paid, either party may thereupon submit the question to be determined to the Circuit Court of Lake County or other court having jurisdiction of the parties, and each party agrees to be bound by the determination and judgment of such court."

The agreement also contained a clause which stated that Carolee accepted all of the terms in the agreement as a final settlement of all of her rights, including her inheritance rights, rights to alimony, and any claims to property held in Alfredo's name.

The agreement was submitted to the Lake County court for approval, and the court found it to be fair and reasonable and adopted the agreement as a part of the divorce decree.

At the time the decree was entered, on September 23, 1973, and at the

time Alfredo entered into the agreement, two weeks before the entry of the decree, Alfredo knew Carolee was planning to remarry shortly after the divorce decree was entered. Carolee married her present husband, John Eichelman, in December 1973, two months after the divorce decree and one month after the "maintenance and support" payments were to begin. Alfredo learned of Carolee's marriage in December 1973. Alfredo himself remarried in February 1974. Shortly after the divorce, both parties moved to residences in Chicago and have lived there since.

On January 1, 1974, Alfredo began making the monthly payments called for in the agreement and continued to make them until April 19, 1979, when he filed his petition for modification in the present case. For the tax years 1974 through 1976, Carolee, on her Federal income tax returns, declared the $55,000 per year she was receiving from Alfredo as "alimony" taxable to her. (See 26 U.S.C. §71 (1976).) For the same years, Alfredo declared the payments as an itemized deduction. See 26 U.S.C. §215 (1976).

Sometime in 1977, Carolee informed Alfredo that she could no longer support herself and the four younger children on the $55,000 per year less taxes. She asked Alfredo for more money. Alfredo refused.

In early 1978, Carolee filed her Federal income tax return for the tax year 1977. In this return, Carolee failed to declare the $55,000 per year as income taxable to her. She notified the IRS that the payments were for support of the minor children, making the payments exempt from her income. (See 26 U.S.C. §71(b) (1976).) Carolee also filed amended returns for the tax years 1974 through 1976, seeking a refund of all taxes she had previously paid on the $55,000 per year.

In April 1978, Alfredo filed his Federal income tax return for tax year 1977 and claimed the payments as a deduction. Shortly thereafter, the IRS sent Alfredo notice that he was to be audited to determine whether he could claim the payments as a deduction and to determine whether he should pay back taxes with interest and penalties for the tax years 1974 through 1976.

After several months of dispute with the IRS, Alfredo was told the IRS had decided to deny him a tax deduction on the annual payments and had decided that he would have to pay back taxes with interest and penalties on the $55,000 per year he had paid to Carolee. Moreover, the IRS informed Carolee that she would be required to include all the payments made by Alfredo as income taxable to her.

To understand this dual-taxation decision of the IRS requires a basic understanding of the applicable tax law. As a general rule, "alimony" payments made by a divorced husband to a divorced wife are taxable to the wife and deductible by the husband. (26 U.S.C. §§71, 215 (1976).) In practice, this rule should be considered only as a guide to further analysis.

In actuality, the divorced wife must declare payments made to her by a divorced husband as "alimony" taxable to her under section 71 of the Internal Revenue Code (26 U.S.C. §71 (1976)), and the husband may deduct the payments under section 215 of the Code (26 U.S.C. §215 (1976)), if and only if all of the following requirements are met:

(1) the payments are "periodic";

(2) the payments are made in recognition of the husband's duty to support the wife, and thus are not made to the wife for her relinquishment of ascertainable property rights and not made to the wife exclusively for the support of the minor children in her custody;

(3) the husband makes the payments because a divorce decree has ordered him to do so or because he has agreed to do so in a written agreement entered into with the wife; and

(4) if the payments are made pursuant to a divorce decree, the husband must have a "legal obligation" to make the payments under the applicable law of the State in which the decree was entered; however, if the payments are made pursuant to a written agreement, the husband need have no "legal obligation" under local law to make them, and thus even if the agreement is unenforceable under local law, the payments are still taxable to the wife as "alimony" and deductible by the husband as long as the other three requirements listed above are met.

See 26 U.S.C. §§71, 215 (1976); Treas. Reg. §1.71—1; *United States v. Davis* (1962), 370 U.S. 65, 8 L. Ed. 2d 335, 82 S. Ct. 1190; *Commissioner v. Lester* (1961), 366 U.S. 299, 6 L. Ed. 2d 306, 81 S. Ct. 1343; *Wright v. Commissioner* (7th Cir. 1976), 543 F.2d 593; *Hoffman v. Commissioner* (7th Cir. 1972), 455 F.2d 161; *Taylor v. Campbell* (5th Cir. 1964), 335 F.2d 841; see generally II Illinois Family Law §14 (Ill. Inst. Cont'g Legal Educ. 1978); Harris, *The Federal Income Tax Treatment of Alimony Payments—The "Support" Requirement of the Regulations*, 22 Hastings L. J. 53 (1970); Note, *Alimony: Income Taxation of Installment Payments*, 24 U. Fla. L. Rev. 499 (1972).

The absence of any one of the requirements means the husband cannot deduct the payments. However, it does not necessarily mean the wife escapes taxes on the payments. It simply means she does not have to declare the payments as "alimony" taxable to her under section 71 of the Code (26 U.S.C. §71 (1976)). (See *Hoffman v. Commissioner* (7th Cir. 1972), 455 F.2d 161.) She may still have to declare them as "gross income" taxable to her under section 61 of the Code (26 U.S.C. §61), unless she can show the payments are exempt or deductible under another section of the Code. See Rev. Rul. 81—8, 1981-82 I.R.B. 6; *Joss v. Commissioner* (1971), 56 T.C. 378.

Alfredo's and Carolee's problems with the IRS were caused by the fact of Carolee's remarriage in December 1973. The payments in the settlement agreement were designated as having been for Carolee's "maintenance and support." Because of all the conditions attached to the making of the payments, especially that they could change at any time due to a change in circumstances of the husband or wife, the contract term had every appearance of being a term that required Alfredo to pay "periodic alimony" to Carolee. (See *Adler v. Adler* (1940), 373 Ill. 361, 26 N.E.2d 504, *cert. denied* (1940), 311 U.S. 670, 85 L. Ed. 430, 61 S. Ct. 29; *Roberts v. Roberts* (1967), 90 Ill. App. 2d 184, 234 N.E.2d 372.) Illinois divorce law in effect at the time of the parties' divorce provided, "A party shall not be entitled to alimony and maintenance after remarriage * * *." (Ill. Rev. Stat. 1973, ch. 40, par. 19 (repealed 1977).) Because of this prohibition against payments of alimony after the receiving spouse's remarriage, one could conclude, as the IRS apparently did, that Alfredo was not "legally obligated" under Illinois law to make any of the payments he made to Carolee because all of the payments were made after her remarriage.

Because of this lack of a "legal obligation," the deductibility of the payments made by Alfredo depended on whether the fourth requirement of Federal law, listed above, for such deductibility, was met. If the payments could have been deemed to have been made pursuant to a written agreement, Alfredo could have still deducted them because the "legal obligation" requirement did not have to be met. However, if the payments could have been deemed to have been made pursuant to the parties' divorce decree, Alfredo could not have deducted them because of the "legal obligation" requirement.

Though one could conclude Alfredo made the payments pursuant to the settlement agreement, Alfredo was faced with another rule of the Federal courts which apparently prevented Alfredo's deduction. If the State law applicable to the divorce holds that a predivorce written agreement when incorporated in a decree becomes "merged" in the decree and loses its independent legal significance as a result, then any payments made after the entry of the decree will be deemed to have been made pursuant to the decree and not pursuant to the written agreement. (*Hoffman v. Commissioner* (7th Cir. 1972), 455 F.2d 161.) In Alfredo's case, since the settlement agreement was adopted by the court as a part of the divorce decree, there is support for the conclusion that the agreement thereby became "merged" in the decree. (*E.g., Herrick v. Herrick* (1925), 319 Ill. 146, 149 N.E. 820.) Consequently, the IRS could have concluded Alfredo was not entitled to a deduction because the payments were made pursuant to the divorce decree and he had no "legal obligation" under Illinois law to make them.

Carolee's problems with the IRS were somewhat different. She attempted to exempt the payments from her income as child support. (See 26 U.S.C. §71(b) (1976).) The difficulty with her assertion was that the agreement clearly designated the payments to be for her support and not the children's. Also, the payments were to extend well beyond the 21st birthday of the youngest child (the cut-off age for the exemption under Federal law). Thus, she faced a difficult, if not impossible task, of proving the payments were exempt as support for the minor children.

It is an established principle of Federal income tax law that all transfers of anything of value from one party to a taxpayer are presumed to result in "gross income" to the taxpayer, on which the taxpayer must pay an income tax, unless the taxpayer can show the transfer is exempt or deductible under a specific section of the Internal Revenue Code. (See 26 U.S.C. §61 (1976); *Commissioner v. Lo Bue* (1956), 351 U.S. 243, 100 L. Ed. 1142, 76 S. Ct. 800.) Since Carolee could not show that the payments were exempt as child support, then even though she did not have to declare them as "alimony" income under section 71 of the Internal Revenue Code (26 U.S.C. §71 (1976); see *Hoffman v. Commissioner* (7th Cir. 1972), 455 F.2d 161), she still had to declare them as "gross income" taxable to her under section 61 of the Code (26 U.S.C. §61 (1976); see Rev. Rul. 81—8, 1981-82 I.R.B. 6; *Joss v. Commissioner* (1971), 56 T.C. 378).

Thus, the IRS found that both Alfredo and Carolee were obligated to pay taxes on the payments. At the present time, both parties apparently are challenging the IRS's decision in Federal tax court, and as yet no final ruling has been made at that level.

When Alfredo learned that he could not deduct the payments and owed back taxes with interests and penalties, he brought his present petition for modification in the circuit court of Cook County. At the trial level, Alfredo sought either modification or termination of the payments, and sought declaratory relief.

Specifically, Alfredo first asked the court to declare that he had had a "legal obligation" under the old Divorce Act to make all of the payments he had made before filing his petition. Second, he asserted that the new Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 101 *et seq.*) applied to his petition for modification (see Ill. Rev. Stat. 1979, ch. 40, par. 801(c)). Under this Act, Alfredo alleged that the payments had to be modified or terminated as of the date of filing his petition because any or all of the following facts constituted a sufficient "change in circumstances" for such modification or termination:

    (1) Carolee's remarriage;

    (2) Carolee's attempt to change the parties' tax status—Alfredo contended that the parties had originally intended by their settlement agreement for Alfredo to get a deduction for all the payments

and Carolee's actions constituted a repudiation of the agreement; (3) Carolee still had four children living with her but only two of them were minors and thus she allegedly no longer needed the entire amount of the payments.

Based on these facts, Alfredo asked the trial court to terminate the payments as of the date of his filing the petition and in their stead establish a reasonable amount of support for the two minor children. If the court chose not to terminate the payments, Alfredo asked the court to modify the payments to some lower amount to reflect the possible taxes he would have to pay.

At the trial level, Carolee denied that any "change in circumstances" had occurred. She alleged that her remarriage could not have been a change in circumstance because the parties had known when the agreement was made that Carolee was going to be remarried shortly after the divorce decree was entered. She alleged that her attempt to change the parties' tax status could not be considered a "change in circumstances" because the parties had always intended for the payments to be for the support of the minor children, and thus had intended for her to exempt the payments from her income and for Alfredo to pay the taxes. Alternatively, she alleged that her attempt to change the parties' tax status could not be deemed a "change in circumstances" because the Federal authorities had made no final decision and no "change in circumstances" could occur until such a decision was made.

Carolee acknowledged that only two of the four children living with her were under 18, but asserted and showed that the two older children were attending college and the two younger children were attending private high schools and she was paying the tuition and support for all four of the children. Carolee agreed that Alfredo had had a "legal obligation" to make all of the payments he had made, but asserted he had such obligation because the payments were for child support.

Before the case went to trial, Alfredo unilaterally stopped the monthly payments. After a hearing upon Carolee's motion to renew the payments, the trial court ordered Alfredo to continue making the payments during the pendency of the case, finding that Alfredo was "legally obligated" to do so under Illinois law. Alfredo obeyed this order.

At trial, the facts we have set out in this opinion were brought out.[1] In addition, it was shown that Alfredo was now earning $142,000 per year.

---

[1] Evidence was presented at trial concerning the negotiations of the parties before they entered into the settlement agreement. This evidence was admitted despite the parties' respective objections under the parol evidence rule. On appeal, Carolee has raised the issue of the admissibility of some of this evidence. However, we find no need to consider this issue because the facts we have already set out were sufficient for a proper decision in this case and in reaching our decision we have ignored the evidence objected to by Carolee.

Following the presentation of the evidence, the trial court entered its final order on April 24, 1980. In this order, the trial court found that none of the facts alleged by Alfredo constituted grounds for modification or termination of the payments. The court held that Alfredo had always been "legally obligated" to make the payments and ordered Alfredo to continue the payments in the future. The court did not state why such a "legal obligation" existed.

Though the court denied Alfredo's petition for modification, the court went on to find that the parties had always intended for Alfredo to have a tax deduction for the payments and for Carolee to pay the taxes. Because of this, the court entered an order effective as of February 1, 1980, which contained the following essential terms:

(1) the parties were to establish an interest-bearing escrow account;

(2) Alfredo was to deposit 35 percent of all future payments called for in the separation agreement into the account and pay the other 65 percent to Carolee;

(3) if the Federal authorities determined that Carolee was entitled to a refund on the taxes she had paid for the tax years 1974 through 1976, any refund received by Carolee would be deposited in the escrow account;

(4) thereafter, if the Federal authorities determined that Alfredo was not entitled to a deduction for all the years in which he took a deduction, all amounts in the escrow account were to be used to pay any amounts Alfredo owed in taxes, interest, and penalties to the Federal government;

(5) if the Federal authorities determined that Alfredo was entitled to the deduction, all amounts in the escrow account were to be turned over to Carolee.

Both parties appealed from this order.

OPINION

I

*Effect of Carolee's Remarriage*
*Under the Divorce Act*

The first issue we must determine is whether Alfredo's duty to make the payments terminated upon Carolee's remarriage. In discussing this issue, we must recognize that the parties clearly intended for Alfredo's duty to make the payments to continue despite the fact of Carolee's remarriage. The question before us is whether the termination of alimony upon remarriage provision contained in the old Divorce Act (Ill. Rev. Stat. 1973, ch. 40, par. 19) defeated the parties' intent.

A decision on this issue first depends on whether the payments were exclusively for child support as alleged by Carolee or were in the nature of support for Carolee. If the payments were for child support, then of course Alfredo had a duty to make them and we would need to discuss the issue no further. However, the facts of this case make it impossible to classify the payments as "child support." The agreement specifically designates that the payments were for Carolee's support. The agreement sets out 20 years of potential payments and provides that new amounts were to be negotiated after the 20-year period. Even if the payments were to end after 20 years, by that time the youngest child of the parties would be 28 years old, long past any age that would necessitate payments of "child support." The payments could have been changed at any time due to a "change in circumstances" of the husband or wife. Further, we note that child-support payments are not usually subject to a change merely because there has been a "change in circumstances" of the husband or wife. Many other factors must usually be considered before a change can be made. See Ill. Rev. Stat. 1979, ch. 40, par. 505.

Moreover, from the nature of the agreement and surrounding circumstances, it is clear that the parties intended, when they entered into the agreement, that the payments should qualify as "alimony" payments under Federal law so that Alfredo could receive a tax deduction. (See 26 U.S.C. §§71, 215 (1976).) At the time of the parties' divorce, Alfredo was earning $110,000 per year, placing him in the 50-percent tax bracket. (26 U.S.C. §§1, 1348 (1970).) If Alfredo had to pay a Federal income tax without the "alimony" deduction in addition to having to pay social security taxes and Illinois income taxes, he would have been virtually bankrupt. Without the "alimony" deduction, Alfredo would not have entered into the agreement. Further, it is clear that unless the parties had intended the payments to qualify as "alimony" under Federal law, the Lake County trial court could not possibly have approved of the agreement as being "fair and reasonable."

■■ Thus, the payments cannot be classified as "child support." From the nature of the agreement, the parties obviously intended that Carolee should use part of the payments to support the children until they completed college, but this does not mean the payments should be classified as "child support." The payments were primarily intended for Carolee's support and thus they must be classified as being in the nature of support for Carolee.

We turn now to whether the termination of alimony upon remarriage provision in the Divorce Act (Ill. Rev. Stat. 1973, ch. 40, par. 19) terminated Alfredo's duty to make the payments before he even began to make them. Under prior law, there were four distinct methods by which a divorced husband could make support payments to a divorced wife, and,

as we will show, the termination provision of the Divorce Act applied to only one of those methods.

*Periodic Alimony*

The first type of support payment was commonly referred to as "periodic alimony." Alimony, by definition, was an allowance in a decree of divorce, carved out of the estate of the husband, for the support of the wife. (*Adler v. Adler* (1940), 373 Ill. 361, 26 N.E.2d 504, *cert. denied* (1940), 311 U.S. 670, 85 L. Ed. 430, 61 S. Ct. 29; *Stillman v. Stillman* (1881), 99 Ill. 196.) "Periodic alimony" was one form of alimony. It took the form of an order to pay the divorced wife set amounts in regular installments. Its distinguishing characteristic was its indefiniteness. The payments could be changed or terminated by a court upon a "change in circumstances" of the husband or wife. (See *Ihle v. Ihle* (1981), 92 Ill. App. 3d 893, 416 N.E.2d 366.) A wife's right to periodic alimony was terminated by her remarriage under section 18 of the Divorce Act (Ill. Rev. Stat. 1973, ch. 40, par. 19). See *Sudler v. Sudler* (1972), 6 Ill. App. 3d 546, 286 N.E.2d 113.

*Lump sum settlement in lieu of alimony*
*(alimony in gross)*

The second type of support payment was known as a "lump sum settlement in lieu of alimony" or "alimony in gross." This was alimony but it was distinguishable from periodic alimony because it took the form of an order to pay the wife a definite total sum upon the entry of the decree or a definite total sum in installments over a definite period of time. (See, *e.g., Jacobson v. Jacobson* (1964), 50 Ill. App. 2d 244, 200 N.E.2d 379.) Courts could order the husband to pay an alimony in gross award instead of periodic alimony if the parties entered into a predivorce agreement providing for such payments, or, under certain circumstances, even if the parties did not have an agreement. See Ill. Rev. Stat. 1973, ch. 40, par. 19; *Canady v. Canady* (1964), 30 Ill. 2d 440, 197 N.E.2d 42.

Before 1949, the termination of alimony provision of the Divorce Act automatically terminated the husband's duty to pay alimony in gross installments upon the wife's remarriage. (*Banck v. Banck* (1944), 322 Ill. App. 369, 54 N.E.2d 577.) In 1949, the Divorce Act was amended to provide that despite the wife's remarriage she would be entitled to all unpaid installments of "any settlement in lieu of alimony ordered to be paid * * * in the decree." (Ill. Rev. Stat. 1951, ch. 40, par. 19.) After 1949, and at least until the enactment of the Illinois Marriage and Dissolution of Marriage Act in 1977, the wife's remarriage did not affect her right to alimony in gross payments.

Alimony in gross awards could not be changed or terminated by a

court due to a "change in circumstances" of the parties. (*Roberts v. Roberts* (1967), 90 Ill. App. 2d 184, 234 N.E.2d 372.) Also, though to qualify as alimony in gross, the payments were required to be for a "definite" amount payable over a "definite" period of time, parties were allowed to agree to a certain degree of indefiniteness in the payments to the extent that they could agree to have the amounts change upon the wife's remarriage or terminated upon her death. (See, *e.g., Sudler v. Sudler* (1972), 6 Ill. App. 3d 546, 286 N.E.2d 113.) No case has decided the number of conditions that can be attached by the parties to alimony in gross payments and still have them qualify as alimony in gross. Nevertheless, the crucial distinction between alimony in gross and periodic alimony is that alimony in gross cannot be changed by a court due to a "change in circumstances" of the parties, and periodic alimony can be changed. Therefore, if the parties agree that the payments can be changed at any time due to a "change in circumstances" and the court so orders in the decree, it follows that the payments must be considered to be "periodic alimony" and not "alimony in gross."

*Lump sum settlement in lieu of all the wife's interests*
*("property settlement" payments)*

The third type of support payment for a wife was actually a form of "disguised" alimony which our courts held was not "alimony" by any definition. This form of payment was known as a "lump sum settlement in lieu of all the wife's interests" or a "property settlement." (See *Ihle v. Ihle* (1981), 92 Ill. App. 3d 893, 416 N.E.2d 366.) "Property settlement" payments were often confused with alimony in gross because the two had similar characteristics. Both were usually for a "definite" sum payable in installments over a "definite" period of time. However, "property settlement" payments were only ordered to be paid by a court if the parties had agreed to allow them in a predivorce agreement. Also, unlike alimony in gross, which were payments made solely in recognition of the husband's duty to support the wife, in a "property settlement" the wife received the payments in exchange for all her marital rights including her right to support, her inheritance rights, and any ascertainable rights to property held in the husband's name. See *Walters v. Walters* (1951), 409 Ill. 298, 99 N.E.2d 342; *Ihle v. Ihle* (1981), 92 Ill. App. 3d 893, 416 N.E.2d 366.

"Property settlement" payments were not considered to be alimony of any kind and had always been allowed to extend beyond the remarriage of the wife. (*Walters v. Walters* (1951), 409 Ill. 298, 99 N.E.2d 342.) Whether payments were being made as "property settlement" payments depended on an examination of the agreement of the parties and the determination of their intent. (See *Sudler v. Sudler* (1972), 6 Ill. App. 3d 546, 286 N.E.2d 113.) Merely because the parties had designated the

payments as "alimony" did not mean that "property settlement" payments were not intended; likewise, merely because the parties designated the payments as part of a "property settlement" in which the wife had relinquished all her marital rights did not necessarily mean the payments were not alimony. (See *In re Marriage of Workman* (1980), 89 Ill. App. 3d 886, 412 N.E.2d 614.) Much depended on whether the agreement also contained separate terms for the satisfaction of the wife's rights other than support.

"Property settlement" payments were not subject to change due to a "change in circumstances" of the parties. Also, parties could agree to a certain degree of indefiniteness in the payments just as they could do so with alimony in gross. (See *In re Marriage of Workman* (1980), 89 Ill. App. 3d 886, 412 N.E.2d 614.) The number of conditions the parties could attach to such payments and still have them qualify as "property settlement" payments was never determined. However, since the wife relinquished vested interests in return for the payments, one would assume that she would have had to receive some vested right to at least some of the payments to be made. (See *Walters v. Walters* (1950), 341 Ill. App. 561, 94 N.E.2d 726 (concurring opinion), *aff'd* (1951), 409 Ill. 298, 99 N.E.2d 342.) If the parties agreed to allow the payments to be subject to modification at any time due to a "change in circumstances" of the parties, that would be a strong indication that the parties did not intend for the payments to be made in return for the relinquishment of the wife's vested interests, and thus a strong indication that the payments were not "property settlement" payments.

### Contractual support

The fourth method employed by parties to provide support for the wife under prior law had no given name but could have been referred to as "contractual support." This method was often overlooked by our courts but was apparently often used in actual practice. See *The Terminating Events of Section 510(b) of the Illinois Marriage and Dissolution of Marriage Act—Mandatory or Non-Mandatory?* (paper published by the Taxation Subcommittee of the Chicago Bar Association's Matrimonial Law Committee on April 27, 1981).

To understand "contractual support" first requires an understanding of certain principles concerning the law of alimony. Alimony, by definition, was only those payments made for support of the wife pursuant to an order of court in a divorce decree. (*Adler v. Adler* (1940), 373 Ill. 361, 26 N.E.2d 504, *cert. denied* (1940), 311 U.S. 670, 85 L. Ed. 430, 61 S. Ct. 29; *Stillman v. Stillman* (1881), 99 Ill. 196.) Generally, when parties entered into a predivorce settlement agreement containing terms for the post-divorce support of the wife, the agreement would be submitted to

the court for its approval and incorporation into the decree. When the agreement was incorporated into the decree, a presumption arose that the agreement was merged in the decree and therefore no longer existed as a contract. As a result, after the divorce, all rights of the parties were controlled by the decree and all payments to be made for support of the wife were payments ordered to be paid by the court in the decree and not payments made because of some contractual duty. (*Adler v. Adler* (1940), 373 Ill. 361, 26 N.E.2d 504, *cert. denied* (1940), 311 U.S. 670, 85 L. Ed. 430, 61 S. Ct. 29; *Herrick v. Herrick* (1925), 319 Ill. 146, 149 N.E. 820.) Thus, support payments for the wife, since they arose out of the decree and not the contract, were considered alimony, by definition, and even if the parties had agreed to extend the payments beyond the wife's remarriage, the statutory prohibition against payments of alimony beyond remarriage controlled the husband's duty to make the payments. See *Walters v. Walters* (1951), 409 Ill. 298, 99 N.E.2d 342; *Adler v. Adler* (1940), 373 Ill. 361, 26 N.E.2d 504, *cert. denied* (1940), 311 U.S. 670, 85 L. Ed. 430, 61 S. Ct. 29.

Since alimony consisted only of those support payments that arose out of a decree, a question arose as to what would occur if the parties prevented their predivorce agreement from becoming merged in the decree and thus retaining its independent legal significance after the decree. Case law in Illinois indicated that the support payments the parties had agreed to could be enforceable as contractual rights despite the wife's remarriage if the parties had agreed to extend the payments beyond remarriage. (*Adler v. Adler* (1940), 373 Ill. 361, 26 N.E.2d 504, *cert. denied* (1940), 311 U.S. 670, 85 L. Ed. 430, 61 S. Ct. 29.) As a result, parties began to use "contractual support" arrangements as a means of extending support payments beyond a wife's remarriage.

Before a decree of divorce, the parties would enter into a typical settlement agreement containing terms for the support of the wife after the entry of the decree. The parties would also agree that the wife's remarriage would not affect the husband's obligation to make the payments. The payments could be for lump sums payable in installments, but there was no requirement that the payments had to be in the form of lump sum settlements, and the payments could have had every appearance of being "periodic alimony." In the agreement, the wife would agree to waive her right to alimony. The parties would submit the agreement to the court for its approval but would request that the agreement not be incorporated in the decree or would request adoption of the agreement by the court but specifically disclaim an intent to merge the agreement into the decree. In this way, the support terms would be enforceable beyond the wife's remarriage, if the parties had so agreed, as contractual rights. Though the wife could not resort to summary enforcement

remedies such as contempt to compel the payments, she could enforce the contract under general legal and equitable principles.

The reasons parties opted to enter into "contractual support" arrangements extending support payments beyond the wife's remarriage had little to do with any desire on the part of the husband to support the wife. The primary reason was to take advantage of favorable Federal income tax laws. In reality, a substantial portion of the payments were nothing more than disguised child support, but by designating the payments as support for the wife, the husband would get the tax deduction and the wife would pay the taxes. (See *Commissioner v. Lester* (1961), 366 U.S. 299, 6 L. Ed. 2d 306, 81 S. Ct. 1343.) If the husband earned a substantial income and the wife did not, both parties would consider such an agreement favorable. The husband would be willing to pay a greater sum with the deduction than he would if the payments were designated for child support alone, in which case he would have received no tax deduction. The wife, since she was in a lower tax bracket, would be willing to pay the taxes on the payments. Also, by designating the payments as support for the wife, the payments could be made beyond the children's 21st birthday and could be used for the children's college education without changing the tax consequences of the payments—under Federal law the wife can exempt from her income only payments made for the support of the "minor" children. See 26 U.S.C. §71(b) (1976)

Moreover, by preventing merger and keeping the contract i.. force after the decree, the parties avoided the havoc that could have been caused to their tax situation upon the wife's remarriage by the "legal obligation" requirement of Federal income tax laws concerning alimony payments that arose out of a decree.

*Alfredo's duty*

Having set out the four methods of support payments employed under prior law, we come now to the issue of Alfredo's duty to make the payments under the Divorce Act. The payments were intended by the parties to be for Carolee's support. The parties intended that the fact of Carolee's remarriage should not terminate the payments. The parties specifically agreed that the payments could be changed at any time due to a "change in circumstances" of the husband or wife, except that the fact of Carolee's remarriage could not be considered a change in circumstances. Though 20 years of payments were set out, the parties also agreed to negotiate new amounts to extend beyond 20 years if new amounts were needed.

Because of all the conditions the parties attached to the payments, we find it impossible to conclude that the payments qualified as alimony in gross. The "change in circumstances" language in the agreement prevents

such a conclusion. We also find it impossible to conclude that the payments qualified as "property settlement" payments, even though the agreement contains "boilerplate" language to that effect. The home, the only significant property asset of the parties, was divided in another term of the agreement. Alfredo was to keep in force $195,000 worth of life insurance held on his life for Carolee's benefit, and this compensated for her relinquishment of inheritance rights. Carolee received no vested right to any of the payments which indicates she was not actually relinquishing any vested interests in return, thus proving that "property settlement" payments were not intended.

■■ Consequently, we are left with only two choices. The payments were for "periodic alimony" or the parties actually intended that the agreement should not be merged in the decree and thus the payments were for "contractual support." To conclude that the payments were "periodic alimony," and thus that Alfredo had no duty to make them, would be contrary to the evidence in the record. Alfredo actually made the payments and even he insists he had a duty to make the payments, at least until he filed his petition for modification. Both parties, when they entered into the agreement, intended the payments to extend beyond Carolee's remarriage and thus could not have intended for the payments to be "periodic alimony." Thus, it is clear that we must conclude that no merger of the agreement into the decree occurred in this case. A holding of nonmerger is the only just solution. The parties must not have intended merger, and we find no just reason to defeat this intent. Accordingly, we hold that the parties' settlement agreement did not merge in the divorce decree. Thus, we find that Alfredo had a duty to make the payments, at least until he filed his petition for modification, because the payments were for "contractual support" and not alimony terminable upon Carolee's remarriage under the provisions of the Divorce Act (Ill. Rev. Stat. 1973, ch. 40, par. 19).

## II

### Effect of Carolee's Remarriage
### Under the Illinois Marriage
### and Dissolution of Marriage Act

The second issue we must address is whether Alfredo's duty to make the payments terminated automatically upon his filing his petition for modification under the Illinois Marriage and Dissolution of Marriage Act (IMDMA). Because of Carolee's remarriage was the trial court required to terminate the payments as of the date of the petition because of the termination of maintenance provision in the IMDMA (Ill. Rev. Stat. 1979, ch. 40, par. 510(b))?

The provisions of the IMDMA were applicable to Alfredo's petition for modification. (Ill. Rev. Stat. 1979, ch. 40, par. 801(c).) Under section 502 of the IMDMA, the doctrine of merger has been abolished and settlement agreements incorporated into a judgment are enforceable both as judgment terms and as contract terms. (Ill. Rev. Stat. 1979, ch. 40, par. 502(e).) Also, in a settlement agreement the parties may expressly agree to the maintenance (alimony) payments to be made and may preclude or limit a court's power to modify the terms of maintenance in the future. Ill. Rev. Stat. 1979, ch. 40, par. 502(f).

Under the IMDMA, the support term of the parties' agreement could be found to be a provision for maintenance. (See *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 404 N.E.2d 469.) Since Carolee had no vested right to the payments, and since the parties expressly agreed that the payments could be modified, the trial court had the power to modify or even terminate the payments under the IMDMA. (See Ill. Rev. Stat. 1979, ch. 40, par. 510(a); *Lamp v. Lamp* (1980), 81 Ill. 2d 364, 410 N.E.2d 31.) Nevertheless, it is clear the parties intended to limit the court's power to modify or terminate by precluding the trial court from considering the fact of Carolee's remarriage as a change in circumstances requiring modification or termination. The question here is whether the parties' intent could be carried out following the filing of the petition for modification because of the termination of maintenance provision in the IMDMA.

When Alfredo filed his petition, section 510(b) of the IMDMA (Ill. Rev. Stat. 1979, ch. 40, par. 510(b)) provided:

> "The obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis."

Certain appellate courts have interpreted this section to mean that all forms of support for the wife except those in the form of "property settlement" arrangements are automatically terminated by the happening of one of the events in the section. (*Ihle v. Ihle* (1981), 92 Ill. App. 3d 893, 416 N.E.2d 366; *Warren v. Warren* (1980), 88 Ill. App. 3d 543, 410 N.E.2d 915; *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 404 N.E.2d 469; see *In re Marriage of Pearson* (1981), 101 Ill. App. 3d 422, 428 N.E.2d 578.) Thus, if we were to follow these decisions, we would have to conclude that the trial court was required to terminate the payments as of the date of Alfredo's filing his petition because of the fact of Carolee's remarriage. ██ On August 14, 1981, the Governor of Illinois signed into law Public Act 82-194. (1981 Ill. Legis. Serv. 912 (West).) This Act amended section 510(b) of the IMDMA to read:

*"Unless otherwise agreed by the parties in a written separation agreement set forth in the judgment or otherwise approved by the court,* the obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." (Emphasis added.)

The effective date of the amendment is January 1, 1982. Since Alfredo's petition was filed in 1979, and since the amended portion does not go into effect until 1982, we cannot apply the amendment to this case. Nevertheless, we believe the amended portion was intended by the legislature to merely clarify its original intent when it enacted the IMDMA in 1977. Therefore, we hold that as of the effective date of the IMDMA, October 1, 1977, parties were allowed to enter into written separation agreements in accordance with section 502 of the IMDMA (Ill. Rev. Stat. 1979, ch. 40, par. 502), which extended maintenance beyond the terminating events of section 510(b).

The reason we disagree with the other decisions which have held that the original section 510(b) acted to automatically terminate all forms of support for the wife except those in the form of "property settlement" arrangements is that none of those decisions properly analyzed section 510(b) in relation to section 502 which concerns separation agreements. Under section 502, parties may enter into separation agreements which provide for maintenance terms and which provide for limitations upon a court's power to modify maintenance in the future. (Ill. Rev. Stat. 1979, ch. 40, pars. 502(a), (f).) The parties may allow the agreement to be incorporated into the judgment of dissolution, and if they do so, the terms of the agreement will be enforceable both as judgment terms and contract terms. (Ill. Rev. Stat. 1979, ch. 40, par. 502(e).) Because of section 502, merger as it was known under prior law has been abolished. See Ill. Ann. Stat., ch. 40, par. 502(e), Historical and Practice Notes, at 402 (Smith-Hurd 1980).

One of the primary reasons for the legislature's abolishing merger was because of the havoc such merger was causing our citizens under Federal income tax laws. (See Ill. Ann. Stat., ch. 40, par. 502(e), Historical and Practice Notes, at 402 (Smith-Hurd 1980).) Merger was causing havoc because of the "legal obligation" requirement of Federal tax laws concerning alimony payments. Parties were entering into predivorce settlement agreements which provided for support payments that would be made beyond the wife's remarriage. The payments were usually nothing more than disguised child support. The agreements would be incorporated into the decree and merged in the decree, thus losing their independent legal significance after the decree. Thereafter, the wife would remarry but the

husband would continue making the payments. Since the payments arose out of the decree and not the agreement, because of merger, the husband had to have a "legal obligation" under our law to make the payments to retain his tax deduction. Since our law prevented alimony payments beyond the remarriage of the wife, the Federal courts were denying the husband the tax deduction for payments made after the remarriage of the wife because he had no "legal obligation" to make such payments. See, e.g., *Sherwood v. Commissioner* [Dec. 36,013(M)], T.C. Memo. 1979-149.

With the abolition of merger, predissolution separation agreements are now able to retain their independent legal significance after the judgment of dissolution. Thus, maintenance payments can now be deemed to arise out of the agreement and not the judgment of dissolution, and the husband can retain his tax deduction for maintenance payments made after the wife's remarriage because he need not show that he had a "legal obligation" under our law to make the payments. Hence, one of the primary reasons for abolishing merger was to allow for a husband to get a Federal tax deduction for maintenance payments made beyond a wife's remarriage. Since the legislature abolished merger to allow such a result, then obviously the legislature intended for parties to be able to enter into written separation agreements under section 502 of the IMDMA which called for maintenance payments to be paid beyond the receiving spouse's remarriage. Since the legislature intended, under section 502 of the IMDMA, that parties should be able to enter into separation agreements calling for maintenance provisions that extended beyond the receiving spouse's remarriage, it is impossible to conclude that the legislature, in enacting the original section 510(b) of the IMDMA, intended to defeat the primary reason for abolishing merger under section 502. The legislature could not have intended one result under section 502 and the opposite result under section 510(b). Therefore, it becomes clear that the amendment to section 510(b) which goes into effect on January 1, 1982, is merely a clarification of what the legislature originally intended when it enacted the IMDMA. Thus, as of the effective date of the IMDMA, October 1, 1977, we hold that parties have been able to enter into written separation agreements in accordance with section 502 of the IMDMA, which provides for enforceable maintenance terms that extend beyond the terminating events of section 510(b).

■■ We also hold that in the present case the trial court properly found that the fact of Carolee's remarriage could not be considered by the court as grounds for modifying or terminating the support provisions of the parties' agreement as of the date of Alfredo's filing his petition for modification. Though the provisions of section 502 of the IMDMA would appear to require that parties must *expressly* agree in the separation agreement to extend the maintenance terms beyond a wife's remarriage

to effectively limit a court's power to modify or terminate the payments based on such remarriage (Ill. Rev. Stat. 1979, ch. 40, par. 502(b)), the parties' agreement in this case was entered into before the IMDMA was enacted, when agreements were not required to be so specific, and we cannot require that the parties had to meet the strict standards of the IMDMA when they entered into their agreement. Thus, since the parties clearly intended for the payments to extend beyond Carolee's remarriage, the fact that such intent is implied because of the nature of the agreement and surrounding circumstances and is not expressed in writing does not change our holding that the trial court properly refused to consider the fact of Carolee's remarriage as a ground for modifying or terminating the support payments.

## III

■■ The next issue we must address is whether Carolee's actions in causing the parties' present tax problems was grounds requiring modification of the payments. As we have already shown, the parties when they entered into the agreement intended for Alfredo to take a tax deduction for the payments, and thus intended for Carolee to pay the taxes since the only way Alfredo could get a deduction was for Carolee to declare the payments as "alimony" income taxable to her. Carolee's actions have virtually defeated the parties' original intent. If she needed more money, the proper course for her to follow was to petition our courts for a modification as provided for in the agreement. She should not have attempted to reverse the parties' tax status.

Carolee asserts that no change in circumstances has occurred yet because no final decision has been made on the Federal level. However, we believe that the absence of such a decision is all the more reason for modifying the terms of the agreement. As it stands now, the parties are left in an impossible situation. Alfredo is still making the payments with the knowledge that he may have to pay taxes on them even though the parties intended that he should not have to. The Federal authorities may well determine that both parties should pay taxes. Neither party should have to rely on what will occur on the Federal level. It would be unjust to Alfredo to continue the payments as if nothing has happened and then hope the Federal authorities resolve the difficulty.

Though the trial court seemingly denied Alfredo's petition for modification, the trial court's final order was a modification of the agreement. The trial court was obviously trying to find the best solution in a situation that is fraught with chaos. We doubt that anyone could reach a solution that could return these parties to the situation they had before Carolee sought a change in the parties' tax status.

The agreement as it now stands simply cannot continue. Carolee, by

her actions, showed that she no longer intended to be bound to the terms of the agreement providing for the manner in which the payments could be modified. Because of this, we believe that Alfredo should not be bound to provide the support payments in the manner in which they are called for in the agreement. Nevertheless, it is clear that the parties originally intended that the four children in Carolee's custody should be supported throughout their college years. Part of the support payments to Carolee were to be used for this purpose. Though Alfredo should no longer be bound to make the payments in the manner in which they are called for in the agreement, he should now assume the duty of carrying out the parties' intent in the agreement of supporting the minor children and paying the educational expenses of the children until they complete their college studies.

■■ In consequence of all of the foregoing, we hold that Carolee's actions in attempting to change the parties' tax status should have been held to be a substantial change in circumstances requiring modification of the terms of the agreement.

Accordingly, we reverse the trial court's order of April 24, 1980, and remand with the following directions:

(1) That promptly upon remand, the trial court shall enter its order declaring that as of April 24, 1980, the payments being made to Carolee under the parties' agreement shall terminate.

(2) That the trial court, after hearing, shall enter its order, effective April 24, 1980, requiring Alfredo to pay reasonable amounts as support for any of the parties' minor children who reside with and continue in the custody of Carolee. The payments of support shall terminate upon a minor child reaching majority or becoming otherwise emancipated. The trial court shall consider the tax consequences incident to the order it enters.

(3) That the trial court, after hearing, shall enter its order, effective April 24, 1980, requiring Alfredo to pay reasonable amounts for the educational expenses of any of the four children who continue to reside with Carolee. The educational expense allowances shall be appropriate to meet the reasonable needs of each child throughout such child's college years including a reasonable post-graduate period of education. Reasonable conditions and terminating terms shall be established where a child does not attend college or prematurely terminates college or post-graduate studies. The trial court shall consider the tax consequences incident to the order it enters.

(4) That promptly on remand, the trial court shall enter its order terminating the escrow provision set forth in the trial court's order of April 24, 1980, and the trial court's order shall direct that all sums contained in said escrow shall be turned over to Alfredo as his sole property.

(5) That until the entry of the trial court's orders directed to be entered in paragraphs (2) and (3) above, Alfredo shall continue to pay to Carolee a sum equalling 65 percent of the payments called for in the agreement; however, in no event shall Alfredo be obligated to make such payments beyond April 24, 1982. The trial court's order shall also provide that Alfredo shall be given credit for any payments made by Alfredo to Carolee under the trial court's order of April 24, 1980, such credit to apply against the support and educational expenses fixed by the trial court under the provisions of paragraphs (2) and (3) above. In the event the payments made by Alfredo shall have been greater than the allowances fixed under paragraphs (2) and (3) above, no refund shall be due from Carolee to Alfredo for such excess payment.

(6) The trial court shall enter such other orders as may be required to carry out the foregoing directions and mandate of this court.

■■ Finally, we note that the trial court entered an order requiring Alfredo to pay $1,500 to Carolee to cover her costs and attorney's fees in this case. Though Alfredo included this order as part of his notice of appeal, he did not challenge this order in his brief or oral argument and has thus waived any issue concerning these fees, and he is ordered to pay the $1,500 forthwith.

For the reasons noted, we reverse and remand with directions.

Reversed and remanded with directions.

ROMITI, P. J., and JOHNSON, J., concur.