502 So.2d 1118 (1987)
SUCCESSION OF Samuel Wilds BACOT, Jr. a/k/a Samuel W. Bacot, a/k/a Wilds Bacot, a/k/a Pat Bacot.
No. CA-5316.
Court of Appeal of Louisiana, Fourth Circuit.
January 14, 1987.
Writ Denied March 13, 1987.
*1120 Jennifer N. Willis, Cater & Willis, and William P. Quigley, New Orleans, for Danny Washington, intervenor-appellant-appellee.
Darleen M. Jacobs, New Orleans, for Elmo Orgeron, Jr., plaintiff-appellant.
Erroll J. Ware, New Orleans, for Danny Butler, intervenor-appellant.
Patrick F. McGrew, Baton Rouge, for H. William Jolly, III, Mary Etta Jolly, and Bob Conway Jolly, intervenors-appellants.
Vincent Marinello, New Orleans, for Danny Poirier, intervenor-appellant.
Before GULOTTA, CIACCIO and LOBRANO, JJ.
LOBRANO, Judge.
This appeal involves the validity, vel non, of a document purported to be the last will and testament of the deceased, Samuel Wilds Bacot, Jr. (Bacot). Collateral to the issue of the validity of the document in question is the issue of whether a man can be the concubine of another man.
Bacot, an admitted homosexual, never married and had no natural children. Throughout his lifetime, Bacot was also known as Samuel W. Bacot, Wilds Bacot and Pat Bacot.
On January 5, 1982, Bacot executed an authentic act wherein he adopted Elmo Orgeron, Jr. (Orgeron), an adult male, as his son and heir. On that same day, Bacot executed a last will and testament in statutory form, naming Orgeron as executor and sole legatee.
In September of 1984, Bacot was admitted to Charity Hospital in New Orleans (CHNO) suffering with acute chronic virulent type B herpes simplex. This disease caused a buildup of toxic ammonia on Bacot's brain, which increased as his hospitalization progressed. Several weeks later on October 4, 1984, at approximately 2:00 a.m., Bacot asked Carolyn McLain (McLain), a CHNO nurse to bring him a pen and paper so that he could write a will. McLain honored Bacot's request. That night, Bacot wrote the document in question. It is short, is written on a single sheet of stenographic paper and reads, "I leave all to Danny". The document is signed "Wilds Bacot" and contains a series of marks resembling a slashdate of either "10/4/84 or 4/10/84." McLain later retrieved the document from Bacot. She signed, dated it, placed Bacot's CHNO patient number on the document and placed it in his medical file.
Shortly thereafter, Bacot slipped into a coma and died on October 14, 1984. He never regained consciousness and never indicated to anyone the identity of the "Danny" named in the document.
On October 19, 1984, Orgeron petitioned the Civil District Court of Orleans Parish to probate the statutory testament of January 5, 1982. Several homosexual lovers of Bacot, Danny Washington, Danny Poirier and Danny Butler, intervened in the probate proceedings. Each attempted to probate the document in question asserting it to be Bacot's olographic last will and testament and each claiming to be the "Danny" named as legatee. In addition, Bacot's cousins, H. William Jolly, III, Mary Etta Jolly, and Bob Conway Jolly, intervened asserting the statutory testament to be deficient in form and claiming to be the true owners of the succession assets. The Jolly's later amended their original petition to allege the document in question to be the valid olographic testament of Bacot which supersedes the statutory testament.[1]
Following a two day trial, the trial Judge decreed the document in question to be the valid olographic will of Bacot executed on October 4, 1984 and that, as such, it revoked the prior statutory will. The Court found Danny Washington to be the "Danny" *1121 referred to as Bacot's intended sole legatee but limited his legacy to one-tenth (1/10) of the movable property of the succession under Civil Code Article 1481 finding Washington lived in open concubinage with Bacot. The Court based its decision on Washington and Bacot's longtime homosexual love affair and cohabitation wherein they assumed duties and obligations usually manifested by married people. The Court decreed the remainder of the estate to Orgeron as Bacot's adopted son.
All parties appealed the judgment of the trial court asserting the following specifications of error:
Orgeron (the adopted son) asserts:
The trial court erred in holding that the purported olographic testament of October 4, 1984 was valid.
Washington (the concubine) asserts:
The trial court erred as a matter of law in holding that La. Civil Code Art. 1481 applies to homosexual relationships.
The Jollys (the cousins) assert:
1) The trial court erred in holding that La.Civil Code Art. 1481 applies to homosexual relationships;
2) The trial court erred in holding Orgeron to be the adopted son and heir of Bacot as the validity of the adoption was not properly before the court;
3) The implication of the trial court's decision that the statutory will is valid in form and substance is manifestly erroneous as the will failed to meet the requirements of La.R.S. 9:2442.
Butler and Poirier (the "other" Dannys) assert:
The trial court erred in finding Washington to be the "Danny" referred to in the olographic will.
THE OLOGRAPHIC TESTAMENT:
Louisiana Civil Code Articles 1588 and 1589 provide:
Article 1588:
The olographic testament is that which is written by the testator himself.
In order to be valid, it must be entirely written, dated and signed by the hand of the testator. It is subject to no other form, and may be made anywhere, even out of the State.
Article 1589:
Erasures not approved by the testator are considered as not made, and words added by the hand of another as not written.
If the erasures are so made as to render it impossible to distinguish the words covered by them, it shall be left to the discretion of the judge to declare, if he considers them important, and in this case only to decree the nullity of the testament.
The above articles of our code constitute the exclusive statutory requirements for the execution of an olographic testament. The probate requirements for an olographic testament are contained in Louisiana Code of Civil Procedure Article 2883 which provides:
A. The olographic testament must be proved by the testimony of two credible witnesses that the testament was entirely written, dated, and signed in the testator's handwriting. The court must satisfy itself, through interrogation or from the written affidavits or the depositions of the witnesses, that the handwriting and signatures are those of the testator, and except as provided in Article 2890, must mention these facts in its proces verbal.
B. A person's testimony for the purpose of this Article may be given in the form of an affidavit executed after the death of the testator before a notary and two witnesses stating that the olographic will was entirely written, dated, and signed in the testator's handwriting, unless the court in its discretion requires the person to appear and testify orally. All affidavits accepted by the court in lieu of oral testimony shall be filed in the probate proceedings. This Paragraph does not apply to testimony with respect to the genuineness of a will that is judicially attacked.
The principal value of an olographic testament is simplicity. It can be confected *1122 by a layman without the assistance of legal counsel. Succession of Hammett, 183 So.2d 416 (La.App. 4th Cir.1966).
Orgeron asserts that it was error for the trial court to find that the document executed by Bacot on October 4, 1984 met the formal requirements necessary to be an olographic testament. We disagree.

THE DATE:
Orgeron asserts the "date" which appears below Bacot's signature is "illegible" and "uncertain". The trial court determined the date to be October 4, 1984. All testimony indicated this to be the date on which Bacot executed the document. The determination of the date poses two questions. Can parol evidence be used to clarify an ambiguous date and does a strikeover in a date, in and of itself, invalidate a testament?
The question of the use of parole evidence was definitively addressed by our Supreme Court in Succession of Boyd, 306 So.2d 687 (La.1975). The high court concluded that public policy demanded that extrinsic evidence be allowed to clarify an ambiguous date on an olographic testament. Justice Dixon (now Chief Justice) speaking for the Court stated:
"... The strong public policy of the State, sustaining the validity of wills and giving effect to the testator's wishes when possible ..., combined with the high incidence of wills written without legal assistance, have resulted in much litigation over dates, alone...." Id. at 688.
The Court then quoted with approval the following language from Succession of Lefort, 139 La. 51, 71 So. 215, decided in 1916:
"But there is no law that prevents the courts from hearing testimony and entertaining evidence to throw light upon an obscure date, and remove all doubt, uncertainty, or ambiguity concerning it."
* * * * * *
"Any evidence, recognized by law and not expressly prohibited by statute, calculated to convince the court and establish the certainty of the date, should be admitted and heard." Succession of Boyd, supra at 689.

In the instant case, the slash-date on the will is either "10/4/84" or "4/10/84". McLain, the supervising nurse at CHNO who provided Bacot with the pen and paper with which he executed the will, testified the will was written on October 4, 1984. She saw Bacot writing the will, took the completed will from him, dated and signed it herself, wrote his patient number on it and placed it in his medical file. Thus, McLain's testimony is sufficient to establish the will was executed on October 4, 1984 and is sufficient to comply with the rule set forth in Succession of Boyd, supra.
Orgeron asserts that the number "8" in "1984" is the result of a deliberate strikeover of the number "2" and renders the testament invalid. No evidence was presented at trial that the date on the will was in anyway tampered with. A careful examination of the number "8" does not convince us that its "uneven" form is the result of a conscious strikeover of the number "2". Nevertheless, in the absence of any evidence that the date in a will was tampered with, a strikeover does not, in and of itself, invalidate a document. See, Succession of McCay, 166 La. 681, 117 So. 772 (1928).
We find the date on the will to be a valid date and the trial court correct in finding it to be October 4, 1984.

SIGNATURE OF THE TESTATOR:
The will was signed "Wilds Bacot". Orgeron asserts that because this is not Bacot's full legal name, the signature is invalid.
It is quite clear from the pleadings and evidence that Bacot also used and was known by his middle name, "Wilds". Orgeron's own petition to probate is captioned "a/k/a Wilds Bacot." The testimony and evidence introduced at trial shows Bacot used the name "Wilds" on official documents such as bank account signature cards as well as his rental agreement. The fact that a testator does not use his full *1123 legal name does not render his signature invalid as long as the actual identity of the testator can be ascertained. Succession of Cordaro, 126 So.2d 809 (La.App.2nd Cir. 1961).
The trial court did not err in finding the signature valid.

HANDWRITING OF THE TESTATOR:
Louisiana Code of Civil Procedure Article 2883 provides:
"The olographic testament must be proved by the testimony of two credible witnesses that the testament was entirely written, dated and signed in the testator's handwriting...."
Pursuant to the requirements of the above article Washington produced three witnesses to testify that Bacot wrote, signed and dated the olographic will: Charlotte Ray, Vice-President and Trust Officer at Fidelity National Bank in Baton Rouge, who handled Bacot's trust account, Mary Etta Jolly Fizer, the cousin of Bacot and Carolyn McLain, the supervisor nurse at CHNO.
Ray testified that she was the bank officer who had the primary contact with Bacot's investments and was familiar with his handwriting. She testified the writing in the will looked like Bacot's handwriting and signature.
Fizer testified that she grew up with Bacot and was very familiar with his handwriting. She positively identified the handwriting and signature in the will as belonging to Bacot.
McLain testified that she provided the pen and paper to Bacot to write the will, that she saw him writing the will and identified the will presented at trial as the same document executed by Bacot on October 4, 1984.
Even giving little or no weight to the testimony of Fizer as not the kind of credible witness intended by Article 2883, (because of the collateral agreement with Washington), we must conclude that given the testimony of Ray and McLain, Washington met the probate requirement of La. C.C.Pro. Art. 2883. We find no manifest error in the trial court's finding that the handwriting was that of Bacot.

IDENTITY OF THE NAMED LEGATEE:
Orgeron asserts the identity of the legatee in the olographic will was not proved at trial. Poirier and Butler assert the trial court erred in finding that Danny Washington is the "Danny" named in the will. We agree with the findings of the trial court.
Article 1714 of our Civil Code states:
"In case of ambiguity or obscurity in the description of the legatee, as, for instance, when a legacy is bequeathed to one of two individuals bearing the same name, the inquiry shall be which of the two was upon terms of the most intimate intercourse or connection with the testator, and to him shall the legacy be decreed."
The language of Article 1714 and the jurisprudence interpreting it unequivocally provide that all extrinsic evidence be considered in determining which of the claimed legatees was on terms most intimate with the testator. Succession of Baskin, 349 So.2d 931 (La.App. 1st Cir.1977), writ den. 350 So.2d 1211.
In the instant case, three intervenors named "Danny" assert they are the most probable legatee named in the will.
The evidence clearly showed Danny Washington had the closest relationship to Bacot. Poirier and Butler knew Bacot and each had a sexual relationship with him. However, by their own testimony, their relationships lasted only a few months ending prior to Bacot's death. There is little doubt that the testimony of Poirier and Butler, at best, established a transitory relationship with Bacot purely sexual in nature.
In contrast, Washington produced ample evidence to satisfy the requirements of Article 1714. Washington testified that he and Bacot were lovers, that they resided together for nine years until Bacot's death and that their relationship was one of love and caring. They shared the household chores and duties, maintained joint bank *1124 accounts, jointly entered into a signed rental agreement and were reciprocal beneficiaries on each other's life insurance policies. Washington admitted that he and Bacot did have fights on occasion concerning his [Washington's] alcoholism but that they still cared for one another deeply and that he [Washington] took care of Bacot during all of his illnesses. Mary Etta Jolly Fizer, Bacot's cousin, testified that Washington was well known to her, had attended to Bacot during his illnesses and that the two men lived together for years.
Jan Harris testified that he rented property to Bacot and Washington, often visited them, knew they resided together and knew Washington attended to Bacot during his illnesses.
James Louis Anderson, a long time friend of Bacot, described Washington and Bacot as having a very close relationship and that they lived together for approximately nine years.
Thus, the evidence clearly shows that it was Danny Washington who was on terms most intimate with Bacot. We find no error in the trial court's conclusion that the length and closeness of this relationship, even though it was not without problems, indicates that Bacot intended to leave all to Danny Washington when he wrote the October 4, 1984 will.

DECEDENT'S DONATIVE INTENT:
Orgeron asserts the will fails to show on its face a donative intent necessary to establish it as Bacot's last will and testament. In support of this assertion, Orgeron cites Succession of Shows, 246 La. 652, 166 So.2d 261 (1964). In that case, the testatrix entirely wrote, signed and dated a purported olographic testament, the text of which reads: "All to my sister." In affirming the First Circuit's holding that the document lacked the necessary dispositive language to be a valid last will and testament, our Supreme Court stated:
"A mere perusal of the instrument sought to be probated in the case at bar discloses it totally lacks any language to indicate animus testandi of the decedent and the necessary words to constitute a valid will." Id. 166 So.2d at 263.

Orgeron argues that the instant will is exactly that of the Shows document in that it nowhere, on its face, purports to be a will or purports to dispose of property because the will reads merely "all" and gives no indication as to "all" of what. We disagree. LSA Civil Code Article 1570 establishes the form of donations mortis causa:
"No disposition mortis causa shall henceforth be made otherwise than by last will or testament. Every other form is abrogated.
But the name given to the act of last will is of no importance, and dispositions may be made by testament under this title or under that of institution of heir, of legacy, codicil, donation mortis causa, or under any other name indicating the last will, provided that the act be clothed with the forms required for the validity of a testament, and the clauses it contains, or the manner in which it is made, clearly establish that it is a disposition of last will.
Thus an act of last will, by which an individual disposes of his property or of part thereof, in any manner whatsoever, whether he has or has not charged any one with the execution of his last will, is considered as a testament, if it be, in other respects, clothed with the formalities required by law."
Here, the will reads:
"I leave all to Danny"
The additional phrase, "I leave", distinguishes Bacot's will from the Shows will. This Court in Succession of Hammett, 183 So.2d 416 (La.App. 4th Cir.1966), writ den. 249 La. 66, 34 So.2d 735,[2] specifically considered the question of whether the word "leave" sufficiently expresses donative intent. The Court stated:
"The principal value of an olographic will is its simplicity; it can be confected by a layman without the assistance of legal counsel. (citations omitted). This document *1125 contains the word `leave'. One trained in the law might prefer the use of words such as `bequeath' or `devise', but we are dealing with a document written by a person not so trained and certainly `leave' when used by a layman, indicates the necessary intent."
* * * * * *
"Our conclusion is amply supported by the jurisprudence of our state under Civil Code Article 1713 to the effect that the interpretation of the purported will should be such as to support its validity where possible. The Courts should seek to find in the instrument that which will support rather than defeat, the apparent intention of the testator." Id. at 418.

Orgeron further suggests that the use of the word "all" is too broad to be construed as a disposition of property because it is impossible to determine "all of what".
Whenever possible a will should be read as to lead to testacy, not intestacy. Succession of Carter, 332 So.2d 439 (La.1976); Succession of Kearl, 440 So.2d 179 (La. App. 4th Cir.1983).
In the absence of contrary expressions, the law presumes that when a will is executed the testator intends to dispose of his entire estate. Succession of Carter, supra.
The jurisprudence has recognized that in the interpretation of wills, the first and natural impression conveyed to the mind on reading the will as a whole is entitled to great weight. The testator is not supposed to be propounding riddles, but rather to be conveying his ideas to the best of his ability so as to be correctly understood at first view. Succession of Carter, supra.
Webster's Third New International Dictionary defines "all" as "The whole amount or quantity of...." Naturally, one trained in the law would prefer a more specific phrase such as "all that I die possessed of" or "all my property", but we are not dealing with a document written by one so trained and certainly "all" when used by a layman, indicates the necessary intent to dispose of all that he is possessed of.[3]
Applying the above legal principles to the language of Bacot's will, we find that Bacot intended it to be his last will and testament and to leave to Washington a universal legacy to the extent allowed by law. La.C.C. Art. 1606.
TESTAMENTARY CAPACITY OF THE DECEDENT:
Orgeron asserts the trial court erred in determining that Bacot had the requisite testamentary capacity to make a valid will on October 4, 1984. We disagree.
There is a strong presumption in Louisiana law in favor of testamentary capacity, Succession of Lyons, 452 So.2d 1161 (La. 1984), and it is measured at the time the will is executed. Cormier v. Myers, 223 La. 259, 65 So.2d 345 (1953).
In Lyons, our Supreme Court addressed the burden which one alleging lack of testamentary capacity must carry. The court determined that the applicable standard to be applied was not proof by a preponderance of the evidence, but proof by "clear and convincing evidence"an intermediate standard between preponderance of the evidence and proof beyond a reasonable doubt. The Court found that in a case where clear and convincing evidence is required, the existence of the disputed facts (here, testamentary capacity) must be "highly probable, that is, much more probable than its non-existence."
The Court noted that strong public policy considerations mitigate against the use of the preponderance of the evidence test in a testamentary capacity case. Quoting from Kingsbury v. Whitaker, 32 La.Ann (1880), the Court further stated:
"[T]o wrest a man's property from the person to whom he has given it, and to divert it to others from whom he has desired to withhold it, is a most violent injustice, amounting to nothing less than *1126 post-mortem robbery, which no court should sanction, unless thoroughly satisfied... that the testatory was legally incapable of making a will." Succession of Lyons at 1165.

Here, just as in the Lyons case, the impartial evidence at trial included the testimony and notes of the nurses attending Bacot at the time the will was executed. Dr. Bonnie Boyd, Bacot's treating physician, testified that Bacot's mental state "waxed and waned". However, Dr. Boyd was not present during the early morning hours of October 4th when Bacot executed the will. She expressed reservations about Bacot's capacity to execute a will but stated unequivocally that the attending nurse was in a better position to determine whether or not Bacot was lucid at the time he wrote the will.
Carolyn McLain, the supervising nurse, who provided Bacot with the pen and paper to execute the will, testified as follows:
"Q. At the time of Mr. Bacot's first contact for writing, was he alert?
A. Yes, he was.
MS. JACOBS:
Objection.
THE COURT:
Overruled.
EXAMINATION BY MS. WILLIS:
Q. He gave a perfect response to the question?
A. Yes, he did.
Q. Did he know where he was?
A. Yes.
Q. Did he know who he was?
A. Yes.
Q. At the time that you saw Mr. Bacot, the second time when you gave him the paper to write on, was he alert?
A. Yes.
Q. Was he able to make the perfect response to the questions?
A. Yes.
Q. Did you have a conversation with him at that time to determine whether he could respond?
A. Yes.
Q. Did he know who he was?
A. Yes.
Q. After the attempt to persuade him from making the document, was he adamant about it?
A. Yes, he was.
* * * * * *
Q. Did you find find him confused and disoriented?
A. Not that night.
Q. Not while you were on the shift?
A. No.
Mildred Dix, the practical nurse who attended Bacot during the early morning hours of October 4th, testified that Bacot was not disoriented at the time he wrote the will. Her testimony agrees in all respects with that of McLain. Thus, the evidence presented by the two attending nurses at the time the will was executed indicates in no uncertain terms that Bacot was lucid and that he desired to execute a will because he was afraid he might die before his last wishes could be carried out. We conclude that there was no error in the trial court's finding of testamentary capacity.

ADOPTION OF ORGERON:
The Jollys argue that the trial court erred in upholding the validity of Orgeron's adoption. The only issue before the Court was the probate of two wills, the statutory and the olographic testament. During the trial of that issue an uncertified copy of the authentic act of adoption was introduced in evidence. The Jollys claim they were not prepared to litigate that issue, and object to the Court making a determination at that time. We agree.
Evidence of heirship is concomitant to the adjudication of every succession. La.C.C.Pro. Art. 2821, et seq. However, the proper time to contest heirship is when a judgment of possession is sought by one party, and the other objects to the method of disposition. At that time, all parties can introduce evidence to support or negate heirship. There may be evidence which would invalidate the adoption and the Jollys should have ample opportunity to *1127 present same. We therefore will remand this issue to the trial court for contradictory hearing at the time a judgment of possession is sought.

CONCUBINAGE:
The same argument on the concubinage issue is urged. Since the trial court only had the issue of the validity of the wills before it, it should not have concluded that Danny Washington was a concubine, and therefore was only entitled to 1/10th of decedent's movables. Theoretically, that argument has merit; however, because the issue is a legal one, that is, whether a man can live in concubinage with another man, we shall address that issue since no amount of evidence will change the result we reach.
Using the mandate of Civil Code Article 1714 and Washington's long term relationship with Bacot, the trial judge concluded that Washington is the "Danny" referred to in the will but not "without its own problems". Referring to Civil Code Article 1481, the court determined that Washington was Bacot's "concubine" and therefore was prohibited from receiving more than 1/10 of the value of the movables of the estate. Civil Code Article 1481 reads in pertinent part:
"Those who have lived together in open concubinage are respectively incapable of making to each other, whether inter vivos or mortis causa, any donation of immovables; and if they make a donation of movables, it can not exceed one-tenth part of the whole value of their estate. Those who afterwards marry are excepted from this rule."
Neither the 1808, 1825, nor our present day civil code defines "concubinage" or "open concubinage". In Purvis v. Purvis, 162 So. 239 (La.App. 2nd Cir.1935), the court defined a concubine as follows:
"A concubine should be distinguished from a cortezan or mistress. She is one who occupies the position, performs the duties, and assumes the responsibilities of a wife, without the title and privileges flowing from a legal marriage." Id. at 240.

It is clear, however, that in referring to concubinage, our civil code has always used language which relates only to relationships between men and women. Article 209, dealing with proof of paternity, as originally written, provided in part:[4]
"3. When the mother of the child was known as living in a state of concubinage with the father, and resided as such in his house at the time when the child was conceived."
That article was subsequently amended to include the phrase "... mother and alleged father were known as living in a state of concubinage." See, Art. 209(4) prior to Act 702, 1981.
Article 160, as amended by Act 229 of 1986, dealing with permanent alimony, provides, in part:
"Permanent periodic alimony shall be revoked if it becomes unnecessary and terminates if the spouse to whom it has been awarded remarries or enters into open concubinage."
We therefore are presented with the issue of whether there was ever an intent for the concept of concubinage to apply to homosexual relationships.
Concubinage, in some form, has existed since early recorded history as far back as the Book of Genesis.
"Pilegesh (Biblical date): A concubine recognized among the ancient Hebrews. She enjoyed the same rights in the house as the legitimate wife. Since it was regarded as the highest blessing to have many children, while the greatest curse was childlessness, legitimate wives themselves gave their maids to their husbands to atone, at least in part for their own barrenness...." Succession of Lannes, 187 La. 17, 174 So. 94, 97 (1937), citing Gen. XXXV:22, xlix, 4.
During the Roman Empire, concubinage was widely recognized but only existed as an inferior or secondary status to marriage *1128 and was afforded only certain types of legal recognition. Badillo v. Tio, 6 La. Ann. 129 (La.1851). The Roman concubine was a female cohabitor who never acquired the social or legal status of her male partner nor did the children of such a union.[5]
Concubinage was acceptable even for married men but was distinguished from casual love affairs because of its more permanent nature.[6] It continued as a recognized institution in Rome until Emperor Constantine forbade it; subsequent Christian emperors condemned the practice and it fell into disuse.[7]
Concubinage, in our law, as in ancient times, has traditionally been viewed as a union between a man and a woman, living together as husband and wife but outside of marriage. Unlike marriage, it is not a civil contract and lacks the formalities required by our civil code. See, La.C.C. Arts. 86 and 88. It differs from putative marriage in that the parties have no reasonable belief that they are married. See, La.C.C. Art. 117. Common law marriages have been recognized as states of concubinage in Louisiana. See, Succession of Marinoni, 177 La. 592, 148 So. 888 (1933), at 894.
The Louisiana prohibition against donations between concubines has its origin in the French law which existed prior to the Code Napoleon. The French expression, "don de concubin a' concubine ne baut", prohibiting donations between concubines, was affirmed by Article 132 of the Royal Ordinance of 1629. Succession of Jahraus, 114 La. 456, 38 So. 417 (1905).
Although the Projet of the Code Napoleon recommended the prohibition of donations between concubines, the redactors deleted this provision because of the public scandals which attended succession proceedings under the old law. Succession of Jahraus, supra. However, the redactors of the civil code of 1808 followed the recommendation of the Projet of the Code Napoleon and again prohibited those living together in open "concubinage" from making universal donations or donations of universal title to each other. La.C.C. 1808, Art. 10. Planiol suggests that society has a supreme interest in the duration of unions which create families. Concubinage was frowned upon as a means of avoiding the responsibilities of family associated with marriage, especially the obligations associated with the birth of children. See, Planiol, Civil Law Treatise, Vol. 1, Sec. 697 (La.Law Institute, English Translation, 1959). Those same considerations were carried over into Article 1468 of the 1825 Civil Code which narrowed the prohibition by limiting a donation to only a percentage of the movables, and excepting those who later married. The emphasis was again placed on marriage. Present day article 1481 is nearly identical to article 1468 of the 1825 code.
The jurisprudence interpreting article 1481 indicates that several factors are necessary for the restriction to apply, with the necessary element being the maintenance of a status resembling marriage. Succession of Jahraus, supra.
First, there must be an absence of good faith as to the existence of a legal marriage. Gauff v. Johnson, 161 La. 975, 109 So. 782 (1926). The parties must be "reciprocally guilty; otherwise no disability attaches to the donor." Texada v. Spence, 166 La. 1020, 118 So. 120 (1928). A stable relationship is required and mere acts of sexual intercourse even if frequent and habitual will not constitute a state of concubinage. See, Paxton v. Paxton, 173 So. 488 (La.App. 1st Cir.1937).
Second, Article 1481 requires that concubinage be "open", that is aboveboard. If the parties attempt to conceal the relationship by referring to it as anything other than concubinage, it is not "open". Jones v. Kyle, 168 La. 728, 123 So. 306 (1929). *1129 Thus, parties who disguise the relationship are not living in open concubinage. Even disguising the relationship as a marriage is sufficient to render it closed concubinage. Succession of Lannes, supra.; Miller v. LaFrance, 359 So.2d 328 (La.App. 4th Cir. 1978).
Third, an exception to the prohibition exists for those who later marry each other. The fact that the relationship ceases is not sufficient to lift the prohibition. Thus, persons who discontinue living together are still prohibited from donating to each other absent a subsequent legal marriage between them. Succession of Glynn, 167 So.2d 533 (La.App. 4th Cir.1964), writ denied.
In the recent decision of Thomas v. Thomas, 440 So.2d 879 (La.App. 2nd Cir. 1983), writ den., the court had occasion to consider a recent amendment to Louisiana Civil Code Article 160, involving permanent alimony. Article 160 was amended to read in pertinent part as follows:[8]
"This alimony shall be revoked if it becomes unnecessary and terminates if the spouse to whom it has been awarded remarries or enters into open concubinage."
The Thomas Court was called upon to reconsider the law on concubinage and stated as follows:
"In defining and applying the term open concubinage, the courts have historically insisted that a definite meaning be ascribed to both the words `open' and `concubinage,' before finding that the legal requisites of open concubinage have been proven. `Concubinage' is derived from the Latin term concubinatus. This term signified, in Roman civilization, a relationship or cohabitation in which the man and woman generally resided together as husband and wife without the benefit of the formalities, civil effects and legal consequences of a formal marriage. (citations omitted) Thus to this day, concubinage has retained the signification of a relationship in which a man and woman live together as husband and wife without being legally married." Thomas, supra at 881.

Other courts have used varying descriptions to convey the significance of the concubinage relationship. Concubinage has been described as depicting a "state of affairs in which the man and woman exercise, with respect to each other, the rights and privileges of marriage." Succession of Lannes, supra. It has also been called a relationship of sexual content in which man and woman live together as husband and wife in a state approximating marriage. Succession of Filhiol, 119 La. 998, 44 So. 843 (1907).
It is a familiar rule of statutory construction that the words of a legislative act should not be extended beyond their proper and natural meaning in order to meet particular cases. When our legislature amended Article 160 to provide for termination of permanent alimony upon proof that the spouse receiving alimony was living in "open concubinage" the phrase "open concubinage" had been in our law for some 174 years. Our legislature did not see fit to extend the concept of concubinage to any other type of sexual relationship. In addressing this very issue, the court in Thomas v. Thomas, supra, noted:
"The term open concubinage has a well-established legal significance, and we believe that in employing this term, the legislature intended that it be accorded its traditional and firmly established meaning; had they intended otherwise, they could have employed a different precept which emphasized habitual sexual acts, rather than quasi-marital status." Thomas, supra; at p. 884.
Thus, concubinage has traditionally been described and held to be a relationship in which a man and a woman, that is, two people capable of contracting marriage, are involved in an open, illicit sexual relationship approximating marriage. As has often been observed, the word concubinage describes "a status, and not mere acts of *1130 fornication or adultery, however frequent or habitual." Succession of Jahraus, supra.; Succession of Keuhling, 187 So.2d 520 (La.App. 3rd Cir.1966); Succession of Franz, 232 La. 310, 94 So.2d 270 (1957). The last sentence of article 1481, which removes the prohibition for those who later marry was designed to effect that end.
There is not now, nor has there ever been in our law a legal mechanism for recognizing marriage between persons of the same sex. See, La.C.C. Art. 88. Homosexuals living together, no matter what the duration, can never marry, and therefore such individuals can never be concubines to one another. A concubine is as essential to a state of concubinage as a ghost is to Hamlet.[9] Thus, a man cannot live in open concubinage with another man. The trial court erred in finding that Civil Code Article 1481 applies to the instant case.
We need not address the issue of the validity of the statutory will as we have found the olographic will valid which revokes all prior wills.
For the foregoing reasons, the judgment of the trial court decreeing Danny Washington to be the concubine of Samuel Wilds Bacot, Jr. is reversed.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
NOTES
[1] Danny Washington and the Jolly's entered into an agreement to split all succession assets on a 50/50 basis should the court determine the document in question to be a valid olographic testament and Washington to be the named legatee.
[2] See, also, Succession of Faggard, 152 So.2d 627 (La.App. 2nd Cir.1963) p. 629.
[3] See also, Succession of Maginnis, 158 La. 815, 104 So. 726 (1925), wherein the court interpreted the broad phrase "the contents of" to mean everything contained in the bank box of decedent.
[4] The quoted provisions also appeared in the Codes of 1808 and 1825.
[5] Kathryn Venturators Lorio, "Concubinage and Its' Alternatives: A proposal For a More Perfect Union", 26 Loy.Law Rev. 1 (1980) (hereinafter, Lorio).
[6] Lorio at pps. 5-6.
[7] Lorio at p. 6.
[8] As previously noted Article 160 was again amended by the 1986 legislature. However, concubinage still terminates alimony. We are also aware of the problems with the two versions of Article 160 which are noted in footnote 2 of the Thomas decision.
[9] See, dissenting opinion in Succession of Lannes, supra.