*In re* MARRIAGE OF CAROL WEISBRUCH, Petitioner-Appellant, and JOHN WEISBRUCH, Respondent-Appellee.

Second District   No. 2—98—0392

Opinion filed April 14, 1999.

Scott A. Puma, of Cowlin, Curran & Coppedge, of Crystal Lake, for appellant.

Randy K. Johnson, of Law Office of Robert A. Chapski, Ltd., of Elgin, for appellee.

PRESIDING JUSTICE BOWMAN delivered the opinion of the court:

Petitioner, Carol Weisbruch, appeals the order of the circuit court of McHenry County terminating her right to receive maintenance from respondent, John Weisbruch. Petitioner contends that the court incorrectly found (1) that the settlement agreement permitted maintenance to be terminated and (2) that she was cohabiting with another woman on a continuing, conjugal basis.

The parties were married in 1968 and the court dissolved their marriage in 1980. Pursuant to a settlement agreement incorporated in the judgment, respondent paid petitioner $1,250 per month in unallocated maintenance and child support. At the time, the parties had two minor children, Robert and Scott. By 1990, both children had reached majority, but respondent continued paying $1,250 per month until he filed the petition that is the subject of this appeal.

Respondent filed a petition to terminate child support and maintenance on May 21, 1997. He alleged that petitioner no longer required child support because the younger of the children had reached majority. Moreover, she no longer required maintenance because she had been economically rehabilitated and because she was engaged in a continuing conjugal relationship with Sandra Diesel. Before trial, the parties agreed that child support was no longer appropriate because the parties' children had attained majority.

The court conducted a hearing on the termination of maintenance. The record shows that in 1989 petitioner purchased a single-family house in Woodstock in joint tenancy with Sandra Diesel. They have lived there together since then. Petitioner testified that they purchased the home together because it was more economical to share the costs. Petitioner could not afford the upkeep of the first home she purchased after the dissolution.

The parties' children have stayed at the Woodstock house from time to time, and Diesel's secretary resided there for a while as well. Petitioner and Diesel divide the household expenses, including the mortgage, equally. They have a joint credit union account into which they both deposit their paychecks. Petitioner also deposits respondent's maintenance payments into the account. Petitioner testified that the joint account makes it easier to pay the household bills.

Petitioner and Diesel occasionally borrow money from each other. They have co-signed loans for each other. They are listed as co-owners of their respective cars. They often shop for food together and share the cost, although not always equally. They each have credit cards in their own names. Diesel is named as the executor and primary beneficiary of petitioner's will. The will gives each of petitioner's children a

specific bequest of $1,000. If Diesel predeceases petitioner, the residue of her estate would go to petitioner's sister, Nancy Fredericks.

Petitioner testified that her children are the most important people in her life. Her intention in making the will was that Diesel pay off all expenses related to the house and divide the rest of petitioner's estate between her children. Petitioner admitted that she had few significant assets other than the house.

Diesel is also the primary beneficiary of petitioner's retirement fund, deferred compensation plan, and life insurance policy. Petitioner is the primary beneficiary of Diesel's life insurance policy.

Petitioner executed a health care power of attorney in 1989, designating Diesel as the agent. She did this because she did not believe her children had the ability to make such choices and did not want to burden her sister, who lives in Michigan, with the pain of making such a decision. Sometime after petitioner executed the power of attorney, Diesel became a registered nurse.

The house has three bedrooms. At the time of trial, petitioner's son Scott was living there and each occupant had a separate bedroom. Petitioner and Diesel had shared a bedroom twice for a total of 2½ years, once when Robert lived with them and once when Diesel's secretary was staying with them. On those occasions, petitioner and Diesel slept in the same bed.

Petitioner and Diesel have taken vacations together, traveling to California, Arizona, Pennsylvania, and Michigan. They exchange Christmas and birthday gifts and have sent out joint Christmas letters. They have discussed retiring together to Arizona.

The only affection petitioner and Diesel exchanged was an occasional hug. There was no sexual contact or attraction between them. Both occasionally date.

Petitioner and Diesel can each identify various items of personal property that they own, generally including furniture and pictures. Petitioner can identify the maintenance she receives from respondent in the joint account.

Dr. Robert Shapiro, a clinical psychologist, testified that he defined "conjugal" as a relationship between people "who reside together, are intimately and intricately interwoven and intertwined on a psychological, social, and financial basis." A conjugal relationship would include that of husband and wife. He opined that two people of the same sex, though professing to be heterosexual, may engage in a conjugal relationship. Based upon the depositions and other documents he reviewed, he opined that petitioner and Diesel were engaged in a positive, caring, loving relationship that he considered conjugal. His opinion would not change even if there were no physical attraction be-

tween them. Shapiro found the relationship between the petitioner and Diesel better than many of the marriages he had counseled. He conceded, however, that he had never met the petitioner or Diesel in person. Although such a meeting would have helped him in forming his opinion, he remained comfortable with it.

The court found that petitioner still required maintenance of $950 per month. However, the court also found that petitioner was engaged in a continuing conjugal relationship and therefore terminated her maintenance entirely. Petitioner filed a timely notice of appeal.

■ Petitioner first contends that the court erred in finding that the settlement agreement incorporated in the dissolution judgment permits the termination of maintenance. Section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (the Act) provides as follows:

> "Unless otherwise agreed by the parties in a written agreement set forth in the judgment ***, the obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 1996).

The parties' intent to limit the modification or termination of maintenance must be clearly expressed in the agreement. *In re Marriage of Brent*, 263 Ill. App. 3d 916, 923 (1994).

■ Petitioner relies on the following provision of the settlement:

> "Thirty days after Wife's remarriage, the parties shall agree to an amount for child support and if the parties can not agree, then the matter shall be submitted to the Circuit Court of McHenry County, Illinois for adjudication."

Petitioner contends that this provision means that maintenance terminates 30 days after petitioner's remarriage and that, by implication, her remarriage is the only event that can trigger the termination of maintenance. We disagree.

Such an intention, that can be found if at all by negative implication, is not "clearly expressed." Because the agreement does not allocate the payments between maintenance and child support, this provision means only that if petitioner remarries the parties will attempt to agree upon an amount for child support. It does not attempt to address any other issues. Petitioner's reading of the agreement would mean that maintenance could not be terminated, even if petitioner or respondent died. The trial court correctly concluded that the agreement does not clearly express an intention to override the statutory provisions for the termination of maintenance.

Petitioner next contends that the trial court erroneously found

that she was cohabiting with Sandra Diesel "on a resident, continuing conjugal basis." This argument has two components. She contends that as a matter of law and public policy a woman may not maintain a conjugal relationship with another woman. She also contests the court's factual findings that she was engaged in such a relationship.

One dictionary defines "conjugal" as "of or relating to the married state or to married persons and their relations." Webster's Ninth New Collegiate Dictionary 277 (1990). Another defines it as "[o]f or belonging to marriage or the married state." Black's Law Dictionary 302 (6th ed. 1990). Citing these definitions, petitioner contends that she and Diesel cannot be involved in a conjugal relationship because there is no sexual activity between them. She further contends that their relationship cannot be conjugal because Illinois has a public policy against same-sex marriages. See 750 ILCS 5/213.1 (West 1996). Thus, the relationship cannot be considered marriage-like because they could never be legally married.

■ The supreme court rejected the first of these contentions in *In re Marriage of Sappington*, 106 Ill. 2d 456 (1985). There, the ex-wife argued that she was entitled to continue receiving maintenance because the man with whom she was living was impotent. The court observed that maintenance is predicated on the need for support by the receiving spouse. Thus, it is the financial implications of the relationship that are most relevant to determining the need for maintenance, not the presence or absence of sex. *Sappington*, 106 Ill. 2d at 467. The most important factor is whether the cohabitation affects the receiving spouse's need for support. *Sappington*, 106 Ill. 2d at 467-68; *In re Marriage of Bramson*, 83 Ill. App. 3d 657, 663 (1980).

■ Noting that the dictionary definitions did not mention sex, the supreme court held that a relationship can have a conjugal basis in the absence of sexual relations. *Sappington*, 106 Ill. 2d at 462-63. While sex may be a factor in determining whether a conjugal relationship exists, parties can be cohabiting on a conjugal basis without engaging in sexual relations. "If to avoid the application of this section all that a person had to do was to claim impotency or deny any sexual relations, then the purpose of this statute could easily be defeated." *Sappington*, 106 Ill. 2d at 464. Thus, assuming for the sake of argument that petitioner and Diesel were not engaged in a sexual relationship does not automatically prevent their relationship from being considered conjugal.

The supreme court in *Sappington* also noted a practical aspect to its holding, that direct evidence of sexual intercourse and its frequency will seldom be available. *Sappington*, 106 Ill. 2d at 465. Placing the focus of a maintenance termination proceeding solely on the receiving

party's sexual conduct would encourage parties already engaged in a contentious proceeding to dredge up sordid details of the other party's sex life to attempt to terminate maintenance obligations.

Petitioner also argues that her relationship with Sandra Diesel cannot be considered "marriage-like" because they could not be legally married in Illinois. Whether a paying spouse's maintenance obligation may be terminated because the receiving spouse is engaged in an ongoing relationship with a member of the same sex is an issue of first impression in Illinois.

*Sappington* observed that the purpose of section 510(c) is not to control public morals. *Sappington*, 106 Ill. 2d at 467. The court cited with approval language from *In re Support of Halford*, 70 Ill. App. 3d 609, 613-14 (1979), to the effect that the legislature intended to provide for the termination of maintenance whenever the receiving spouse has entered into a husband-wife relationship with another, whether by legal or other means. The legislature enacted this provision, at least in part, to relieve the injustice from a continuing obligation to support an ex-spouse who is supporting another with the payments or receiving support from another. *In re Marriage of Antonich*, 148 Ill. App. 3d 575, 578 (1986). "Where the relationship has achieved a permanence sufficient for the trial court to conclude that it has become a substitute for marriage, equitable principles warrant a conclusion that the spouse has abandoned his or her rights to support from the prior marriage and is looking to the new relationship in that regard." *In re Marriage of Herzog*, 761 S.W.2d 267, 268 (Mo. Ct. App. 1988).

Illinois courts have routinely focused on the economic realities of the ex-spouse's new relationship rather than on its moral or legal implications. See *In re Marriage of Toole*, 273 Ill. App. 3d 607, 611 (1995); *In re Marriage of Frasco*, 265 Ill. App. 3d 171, 176-77 (1994); *Halford*, 70 Ill. App. 3d at 613. Most nearly on point is *In re Marriage of Roofe*, 122 Ill. App. 3d 56 (1984). In that case, the Appellate Court, Third District, affirmed the termination of maintenance, even though the ex-wife and her paramour could not legally be married because the paramour was still married to someone else. *Roofe*, 122 Ill. App. 3d at 60.

■ In summary, the purpose of the statute is to prevent the injustice of requiring the paying spouse to continue paying maintenance to an ex-spouse who uses the money to support someone else or is receiving support from someone else. In this context, it makes no difference to the paying spouse whether the ex-spouse's new relationship is one that society is prepared to recognize as legitimate or can be legally consummated by marriage. We note that Illinois does not rec-

ognize common-law marriages between members of the opposite sex, yet such a relationship may trigger the termination of maintenance.

We note that the trial court's findings appear facially inconsistent. The court found that petitioner is still in need of maintenance, yet terminated respondent's maintenance obligation entirely upon finding that petitioner was engaged in a conjugal relationship. This same inconsistency appears in *Sappington*, which states that the most important factor is whether the cohabitation affects the receiving spouse's need for support, yet provides for the complete termination of maintenance even where the receiving spouse's needs are not being completely met by his or her new partner. *Sappington*, 106 Ill. 2d at 467-68.

The reason for this is that the statute does not provide for the reduction of maintenance on a proportional basis. Rather, if the receiving spouse remarries or cohabits, maintenance is terminated even if the new partner's contributions are less than the former spouse's maintenance obligations. The same is true even if the receiving spouse is in fact supporting the new partner. The inquiry, as noted by the Missouri court in *Herzog*, is whether the receiving spouse has formed a new relationship wherein the partners *look* to each other for support, not whether the support provided is in fact adequate to meet the receiving spouse's needs.

The parties have brought to our attention cases from other jurisdictions that have considered this issue, but both parties concede that they are not particularly helpful because of statutory or factual differences. For example, in *Van Dyck v. Van Dyck*, 262 Ga. 720, 425 S.E.2d 853 (1993), the relevant statute provided that maintenance could be terminated only where the receiving spouse was cohabiting with a person of the opposite sex. Similarly, in *People ex rel. Kenney v. Kenney*, 76 Misc. 2d 927, 352 N.Y.S.2d 344 (1974), the statute in question permitted termination where the ex-wife remarried or was habitually living with another " 'man' " and holding herself out as " 'his' " wife. *Kenney*, 76 Misc. 2d at ___, 352 N.Y.S.2d at 345. By contrast, section 510(c) is gender neutral.

In *Taylor v. Taylor*, 17 Conn. App. 291, 293, 551 A.2d 1285, 1286-87 (1989), the statute was gender neutral, but the court affirmed the trial court's factual finding that the relationship could not be considered a substitute for marriage. Finally, in *Gajovski v. Gajovski*, 81 Ohio App. 3d 11, 610 N.E.2d 431 (1991), the court held that a homosexual relationship was not "concubinage." The court relied on a Louisiana case that traced the meaning of concubine from the Book of Genesis through the Napoleonic Code, which had been adopted in Louisiana. *Gajovski*, 81 Ohio App. 3d at 13, 610 N.E.2d at 432-33, cit-

ing *Succession of Bacot*, 502 So. 2d 1118 (La. Ct. App. 1987). The dissent pointed to a dictionary definition of "concubine" as a man living in a state of concubinage with another man or a woman. *Gajovski*, 81 Ohio App. 3d at 14, 610 N.E.2d at 433 (Baird, J., dissenting). In language more in tune with Illinois' approach to the question, the dissenting judge stated, "It does not seem readily apparent why the parties would have wanted to continue the alimony merely because the paramour is not legally able to marry the former spouse." *Gajovski*, 81 Ohio App. 3d at 14, 610 N.E.2d at 433 (Baird, J., dissenting).

We agree with the *Gajovski* dissent that the focus should be on the fairness to the paying spouse of requiring him or her to continue maintenance payments and on the continuing need of the receiving spouse for the payments, rather than on the moral and legal implications of the receiving spouse's new relationship. This approach is consistent with Illinois cases that have focused on the need for continuing maintenance and the injustice in requiring the former spouse to continue paying when the receiving spouse is being supported by someone else.

Petitioner also contends that, even if a same-sex relationship may be the basis for terminating maintenance, the trial court's finding that she and Diesel were engaged in a conjugal relationship is against the manifest weight of the evidence.

Petitioner focuses on the lack of a sexual relationship between her and Diesel. They slept in separate bedrooms for most of the time they lived together and there was no evidence that they behaved affectionately in public. Petitioner also attempts to explain their financial interactions as the result of practical considerations. She explained that the joint checking account was primarily for convenience in paying the bills and that she was able to trace the money she received from respondent and deposited in the account. Petitioner further testified that she expected her children to be provided for under the terms of her will. She intended that Diesel would pay off the house and divide the rest of the estate between her children. She trusted Diesel to do this.

Respondent argues that the lack of overt sexual attraction is not dispositive and that the financial arrangements between petitioner and Diesel demonstrate that they are "intertwined," as testified to by Dr. Shapiro. Given the unique nature of personal relationships, each case for termination of maintenance must rest on its own facts. *Frasco*, 265 Ill. App. 3d at 176. A trial court's finding of a conjugal relationship will not be disturbed unless it is against the manifest weight of the evidence. *Toole*, 273 Ill. App. 3d at 611-12; *In re Marriage of Johnson*, 215 Ill. App. 3d 174, 180 (1991).

The trial court's findings here are supported by the evidence. The trial court set forth extensive factual findings in support of its conclusion that petitioner and Diesel were engaged in a conjugal relationship. The evidence recited above demonstrates far more than a casual friendship. The fact that Diesel is the primary beneficiary of petitioner's will, deferred income plan, retirement plan, and life insurance policy demonstrates that she and Diesel are far more than roommates, as petitioner contends, and these actions cannot be explained by considerations of convenience. Although petitioner claims not to understand fully the terms of her will, the fact is that she has chosen specifically to disinherit her two sons—who she testified are the most important people in her life—except for token bequests. If the intention of the will was for Diesel to divide the property between the children, specific bequests would be unnecessary. The trial court's finding was not against the manifest weight of the evidence.

The judgment of the circuit court of McHenry County is affirmed.

Affirmed.

INGLIS and HUTCHINSON, JJ., concur.